[No. 26720.   Department One.   April 13, 1938.]

TONY MARRAZZO, *Appellant,* v. SAM ORINO *et al., Respondents.*[1]

[1]Reported in 78 P. (2d) 181.

*Tom W. Holman, Harold A. Pebbles,* and *Davis, Heil & Davis,* for appellant.

*Don F. Kizer,* for respondent Orino.

*J. Speed Smith* and *Henry Elliott, Jr.,* for respondent Aetna Casualty and Surety Co.

SIMPSON, J.—By this suit in equity, plaintiff sought to cancel his agreement to pay defendant Sam Orino seven thousand dollars out of the proceeds of plaintiff's road building contract.

In substance, in his thirty-one page complaint, plaintiff alleges that he was a contractor engaged in highway construction work in Washington, Oregon, and Idaho; that defendant Sam Orino is a fellow contractor; that defendant Rossi and Rossi Insurance & Investment Company were agents for surety or bonding companies; and that the Aetna Casualty and Surety Company was engaged in the writing of surety or contract bonds.

It is further alleged that the contract in question was entered into October 19, 1933, by the terms of which, among other things, the plaintiff was to pay defendant Orino the sum of seven thousand dollars, in consideration of Orino's becoming an indemnitor to the defendant surety company, Aetna Casualty and Surety Company. This company had signed the bond guaranteeing the performance of the contract entered into between plaintiff and the United States government for the construction of a certain highway in the state of

Idaho known as Idaho City-Stanley National Forest Road Project.

The actions of the various parties leading up to the signing of this contract are alleged as follows: There was a custom among the contractors and surety companies in the vicinity of Eastern Washington, Idaho, and Oregon, where highways were being constructed, whereby the surety company that wrote the bid bond for the contractors also wrote the performance bond, and this custom was well known to the defendants and to the plaintiff, who, during all of the negotiations leading up to the signing of the contract, depended upon such custom.

Prior to the signing of the contract between plaintiff and defendant Orino, all of the defendants had conspired together for the purpose of compelling plaintiff to enter into the contract by first agreeing with plaintiff that the defendant Aetna Casualty and Surety Company, through its agent Rossi Insurance & Investment Company, would write the bid bond for plaintiff upon his contract and afterwards write the performance bond for the performance of the contract; and second, by refusing, after the bid bond had been given, to write the performance bond until such time as plaintiff would agree to pay defendant Orino seven thousand dollars to act and sign as surety to the defendant Aetna Casualty and Surety Company indemnifying it against any loss it might sustain on account of signing the performance bond. All of these matters were unknown to plaintiff, and he was, on account of such actions on the part of defendants, compelled to and did sign the agreement to pay defendant Orino the sum of seven thousand dollars in order to enter into the highway building contract.

The defendants answered separately, putting in issue the allegations of plaintiff's complaint. In addi-

tion, defendant Orino cross-complained, asking for a judgment against plaintiff in the sum of seven thousand dollars, as provided for in his written contract.

At the close of plaintiff's case, defendants challenged the sufficiency of the evidence and moved that the case be dismissed. The motion was granted, judgment of dismissal was entered, and in addition the court gave a judgment against plaintiff in the sum of seven thousand dollars in favor of defendant Sam Orino. From such judgment, the plaintiff has appealed.

After a notice of appeal had been perfected, defendant Rossi died. Probate proceedings have been commenced in the probate court of Shoshone county, Idaho, in which Bernice Ewing Rossi has been appointed administratrix of decedent's estate. She, as such administratrix, has been substituted for Herman J. Rossi as respondent in this appeal.

The only person against whom judgment is sought by appellant is Sam Orino, and the question presented is whether the contract entered into by Orino and appellant was obtained through fraud and business compulsion, and whether there was sufficient consideration to support the contract.

We find it necessary to set out in some detail the actions of the parties to this litigation. Appellant is a naturalized Italian, who has had very little formal education. He came to this country as a boy, and in 1902 started to work for a large construction company as water boy. For many years, he worked for contracting firms in Washington, Montana, Idaho, and Oregon, graduating to the position of foreman in 1915. During the last war, he worked in the Spruce Division at Port Angeles. He started in the contracting business for himself in 1919, at which time he built a small logging road. Since that time, appellant has been engaged in contracting highway construction work,

mostly in Idaho and Washington. His first perform-
ance bond was given in 1923. Contracts obtained by
appellant steadily increased, until in 1928 he was able
to complete a seventy thousand dollar subcontract.

Prior to 1929, he did not have to give bid bonds,
being able to furnish certified checks instead. At that
time, a bank failure compelled him to secure bid bonds
from surety companies, and at first he was able to
obtain them and his performance bonds by having his
mother-in-law act as indemnitor. After a short time,
he was able to secure bid and performance bonds on
his own account. McCrea & Company of Spokane for
a long time wrote bonds for appellant and acted as his
surety adviser. Appellant testified that he had never
read any bonds or applications and couldn't under-
stand them.

Respondent Rossi, operating the Rossi Insurance &
Investment Company, with offices at Wallace, Idaho,
was an experienced bond man and had represented the
Aetna Casualty and Surety Company for many years.
Respondent Sam Orino, who is of Italian descent, was
a general contractor living in Spokane, and a client of
Rossi and Rossi Insurance & Investment Company.
At one time, he told appellant that Rossi was "good
bond man." In 1932, Orino explained to appellant that
Rossi furnished him blank bonds already signed to be
used by Orino whenever he wanted to furnish a bid
bond.

Appellant first met and talked with Rossi in 1930,
and after that at various times Rossi suggested to ap-
pellant that he bid on contracts to be let, and on sev-
eral occasions furnished bid bonds without charge.
At the request of Rossi, appellant, in August, 1932,
furnished, for the purpose of obtaining bonds in the
future, a financial statement, which was later, Septem-
ber 3, 1932, sent to respondent surety company. The

amount of bonding to be covered by the financial statement, for which there was a blank for entry, was left unfilled by the appellant. November 1, 1932, Rossi, representing the surety company, furnished appellant a surety performance bond in the sum of $44,000 on a $73,320.50 contract. Appellant, August 20, 1933, prepared and sent to Rossi another financial statement wherein the amount of bonding was stated at "various amounts," though appellant and his bookkeeper disclaimed any knowledge of those words being in the statement. That statement was received at the home office of the surety company September 23, 1933.

Rossi, August 29, 1933, wrote appellant as follows:

"I am sure the Aetna will furnish you whatever such bonds as you may need. . . . My office here, regardless of my being in town or out, will take care of your needs. . . ."

In July, 1933, Rossi had told appellant to "go ahead and bid," and that he, Rossi, would take care of appellant for the bonds. September 20, 1933, appellant telephoned Rossi about bidding on and getting bonded for the Idaho City-Stanley job, the one involved in this litigation. In this telephone conversation, appellant asked Rossi if he would furnish him the bond for the job. Appellant, on being asked by Rossi what amount he would bid, said, "one hundred eighty-five thousand dollars and up." Rossi told appellant to go ahead and look at the job, and when he got back the bond would be waiting for him. Appellant then inspected the job at its location and returned to Spokane, where he found the bid bond awaiting him. He then figured the job at $185,355.50, made his bid in that amount, filled in the amount of the bid bond at $9,300, and mailed both to the Federal bureau office at Salt Lake City.

The job was awarded to appellant September 28,

1933. Rossi then sent appellant a telegram of congratulations and added: "Will be at your office Saturday." Rossi did go to Spokane on the day mentioned, but appellant was not at home. The matter of writing the performance bond was reported to the home office of the surety company October 1, 1933. The next day, it telegraphed to Rossi, stating appellant's financial statement did not show sufficient net quick assets, and declined to furnish the performance bond. October 3, 1933, Rossi telegraphed appellant as follows:

"Much difficulty obtaining bond. Have solution provided Ralph Davis joins. Continuing efforts. Bank situation unsatisfactory. Rely on me."

On October 4, he sent an additional wire as follows:

"Please meet Ralph Davis at one this afternoon at Hotel Spokane."

Unknown to appellant, Rossi's maximum limit of authority for writing bonds without a reference to the home office of the surety company was seventy-five thousand dollars.

Immediately after receiving the telegram dated October 3, 1933, appellant started out to secure a performance bond from other sources. He went to the office of W. S. McCrea & Company, with whom he had previously dealt, to get a bond and there contacted Mr. Kalin of that firm. Mr. Kalin, after some work, secured a tentative promise of R. L. Rutter to become an indemnitor to the surety company, but was unable after several conferences to secure Mr. Rutter's signature, though appellant agreed to pay him the sum of five thousand dollars to act as an indemnitor. Thereafter, for several days, appellant and Mr. Kalin tried without success to get a performance bond. Appellant made a trip to Tacoma and Seattle for the same purpose, but was unsuccessful.

October 4, 1933, appellant, Rossi, and Orino met at Orino's office in Spokane, where the three proceeded to get drunk. What happened at that time is not disclosed for obvious reasons, but the next day Rossi sent the following telegram to the home office of the surety company:

"Sam Orino joins Tony Marrazzo on Idaho City contract curing your financial objection. Kindly authorize bond."

October 6, 1933, the surety company approved Orino as a co-principal.

After McCrea & Company had decided it could not get a performance bond, appellant, October 16, 1933, called Rossi on the telephone at his office at Wallace, Idaho, but did not reach him, though he asked someone in the office what they were going to do about getting his performance bond. October 17, 1933, he talked with Rossi personally and was told that he would have to get Orino to go on the contract. October 18th, appellant called again about the bond and was invited to consult Rossi at Wallace. Appellant then went to Wallace and talked with Rossi. Rossi told him that Orino would become indemnitor on the performance bond if he would pay seven thousand dollars. Appellant then said, "All right, as long as I get that bond, make it as you say." Thereafter, the application for the bond was completed and mailed to the office of the respondent surety company.

At first, it was agreed that Orino was to become a partner with appellant, but due to the objection of the government's bureau, it was finally decided that the bond would be executed by the surety company and that Orino would simply act as an indemnitor to the company. October 23, 1933, appellant went to the office of attorney Don Kizer and signed a contract, by the terms of which Orino agreed, for the consideration

of seven thousand dollars, to guarantee and insure the performance of the work to be done by appellant on his contract job, and further promised to furnish to appellant all equipment or financial assistance which might be necessary to enable appellant to complete the contract. The contract was read to the signers by Mr. Kizer. Appellant testified that he did not hear half of what was said because his mind was on the job, and that he told those in the office, "I have got to sign this thing, but it is against my will." At another time in the office he said, "Go ahead and I sign anything."

Promptly upon the release of the performance bond, appellant started to work on the job and finished it in 210 days, well within the time allotted by the contract, and at a profit of thirty thousand dollars.

In May, 1934, appellant, feeling that he needed financial help from Orino, demanded a loan of ten thousand dollars, but this was refused him. November 8, 1934, Orino demanded payment of the seven thousand dollars named in the contract, which was refused by appellant, who offered in settlement the sum of two thousand dollars. At the time, Orino said that two thousand dollars was not enough, as he had to divide fifty-fifty with Rossi. Later, Orino said, "If you don't want to pay it I am going to stop your bond on that job." After that threat was made, this suit was instituted.

Appellant contends, as stated in his brief, that this suit was

". . . for relief from the results of a fraud and conspiracy and business compulsion, coupled with culpable negligence of a surety company, practiced on appellant to extort seven thousand dollars of his profits from performance of"

the job mentioned in the pleadings.

He urges, first, that he had no schooling and therefore was an easy victim upon whom fraud could be practiced. Though his school studies were very limited, he had more than made up for such deficiency by practical education resulting from his activities and experience in the contracting business. He had acquired a considerable amount of property and was able in completing the Idaho City-Stanley job to make a substantial profit. It does not appear to us that he was in any way limited in his education in so far as his business was concerned, or in so far as securing bid or performance bonds was concerned.

Appellant calls our attention to the rules announced by this court in several cases, to-wit:

"It is true that it is not necessary, in order to establish the fraudulent conspiracy, that it be shown by direct evidence. It may be established by facts and circumstances; but, as above stated, these facts and circumstances must be inconsistent with an honest purpose and reasonably consistent only with the intent to defraud." *Dart v. McDonald,* 107 Wash. 537, 182 Pac. 628.

" 'Circumstantial proof in most cases can alone bring the fraud to light, for fraud is peculiarly a wrong of secrecy and circumvention, and is to be traced not in the open proclamation of the wrongdoer's purpose, but by indications of covered tracks and studious concealments.' " *American Sav. Bank & Trust Co. v. Bremerton Gas Co.,* 99 Wash. 18, 168 Pac. 775.

"It is true, there need be no evidence of a formally expressed agreement between the alleged conspirators. Conspiracies are seldom susceptible to such proof. But if there is evidence, circumstantial even, of a meeting of the minds and unity of design and of co-operative conduct which could only mean that there was such an agreement, that would be sufficient foundation for the admission of evidence of subsequent independent acts and declarations of each of the parties as against any one of them. *State v. Wappenstein,* 67 Wash. 502, 121 Pac. 989; *Spies v. People,* 122 Ill. 1, 12 N. E. 865; 17

N. E. 898, 3 Am. St. 320; 1 Greenleaf on Evidence, § 111; *Card v. State,* 109 Ind. 415, 9 N. E. 591; *McKee v. State,* 111 Ind. 378, 12 N. E. 510." *State v. Mc-Gonigle,* 144 Wash. 252, 258 Pac. 16.

He invokes the doctrine of business compulsion, which, as stated in 79 A. L. R. 655, is: "A species of duress,—not the common-law duress to be sure, but duress clothed in modern dress."

Appellant has cited our following cases in which we have approved, in effect, the rule just stated: *Duke v. Force,* 120 Wash. 599, 208 Pac. 67, 23 A. L. R. 1354; *Schafer v. Giese,* 135 Wash. 464, 238 Pac. 3; *State v. Winthrop,* 148 Wash. 526, 269 Pac. 793, 59 A. L. R. 1265; *Ramp Buildings Corp. v. Northwest Building Co.,* 164 Wash. 603, 4 P. (2d) 507, 79 A. L. R. 651. Those cases correctly state the law in this state.

However, after a careful study of the evidence contained in the statement of facts and the exhibits, we are unable to conclude that appellant's case falls within those rules of law.

He contends that he was entitled to receive the performance bond because of a custom or practice prevalent in Spokane and vicinity, namely, that the surety providing the bid bond was required to furnish the performance bond. The evidence shows that appellant did not rely upon the custom, but depended upon the contract or promise of Rossi that he would furnish the bonds necessary for the contract. Thus, he was depending upon an express contract between himself and Rossi representing the surety company, and not upon any custom that might be in vogue in the vicinity where he and the respondents were doing business. Appellant was not forced by Rossi or Orino to secure Orino as an indemnitor, nor did he at any time consider himself so bound; because, before he was notified of the Aetna's refusal to supply the performance bond,

he went to his old company, McCrea & Company, and endeavored to secure a bond from them. The action of McCrea & Company disproved appellant's contention that the bonding companies had a secret understanding not to compete with each other after one of them had secured a bid bond. McCrea & Company did everything possible to get their company to write the bond. Their efforts were unsuccessful, because the company they represented said in a telegram dated October 4, 1933:

"Re Marrazzo his net quick less than twenty thousand which is less than difference between his bid and next low on Idaho job and average on five low bidders is two twenty thousand with two top bids eliminated and fact this job cannot be started until next spring adds materially to hazard of surety due to uncertainties cost at that time Stop Aetna had bid bond and obviously declined the final and we regret very much cannot authorize it."

Mr. Kalin, working for appellant, contacted the agent of the Columbia Casualty Company and that company rejected the bond on the ground, as stated by them when they rejected the application:

"Mr. Marrazzo's statement shows about $20,000 net liquid assets. The amount of this contract is $185,000. The next bid was $205,000, and the Engineer's estimate $205,000. The other bids were substantially higher.

"The work is not to be commenced until next spring, and may carry over until the spring of 1935.

"In view of these circumstances, we could not justify participating in this business."

Rossi did not, from October 4th to October 16th, communicate with appellant or in any way attempt to get him to accept Orino as indemnitor, and it was not until he had exhausted every other resource that appellant finally called Rossi's office October 16th, 17th, and 18th, with a plea for aid. His testimony concern-

ing his telephone conversation on the 17th of October, 1933, illustrates appellant's desires:

"A. When I called Mr. Rossi on the 17th I told him to get Sam; I don't care who it is, as long as I get that bond. And Mr. Rossi said, 'I am going to get in touch with Sam right away.' I says, 'Go ahead, Sam or anybody else.'"

Moreover, Orino was not anxious to become indemnitor. He wired Rossi October 18th from Helena, Montana:

"If you can find someone else to sign then let them sign. Unable to come before Saturday. I may not want to sign them."

There was, at the time, good reason to believe that there might be a loss on the contract, as was stated in the answer of the Columbia Casualty Company when it rejected the application for the performance bond.

Appellant contends that he did not know the contents of the indemnity agreement, though it was read to him. The reason is evident when we consider his testimony in that regard.

At the conclusion of the trial, the court, as set out in its memorandum opinion, very clearly demonstrates the reasons that actuated appellant to sign the contract with Orino:

"The trial court is the judge of the credibility of the witnesses and in making this decision I am judging and considering in my own mind the credibility and the weight to be given to the testimony of Tony Marrazzo. All during the testimony of Tony Marrazzo this one thing was impressed upon my mind by this witness; that he never considered any loss that might result under the bid bond or any loss to his reputation and character as a contractor; his whole thought, as I gathered from his testimony, was that he did not want to lose the contract. He had made up his mind that that contract was going to be a very profitable one and he was simply going to move heaven and earth to get

that bond. That was his sole thought. He had been down to the location of the work, realized that there was a large profit to be made, and he did not want to miss out on obtaining the contract; now, that is the way his evidence impressed me, viz., after he had been turned down on a performance bond he was willing to do most anything to get such a bond. So, he entered into the contract in question. . . ."

There is in the great mass of evidence submitted very little testimony that has to do with Orino or his activities. He did at one time recommend Rossi as "good bond man" and met appellant occasionally, but nowhere is there any evidence that he sought to become a surety for appellant even though he would get paid for it.

All Rossi attempted to do was to secure appellant's bond business in a proper and legitimate way, and all of his actions and agreements are consistent with that purpose.

Orino, so far as is disclosed by the evidence, acted honestly in suggesting to appellant that Rossi was a good bond man, and consenting to sign as indemnitor when appellant secured the performance bond furnished by the surety company.

After a consideration of all of the evidence in this case, we are convinced that there was no fraud practiced upon appellant in any of the transactions leading up to the signing of the contract in question.

"Fraud cannot be inferred from facts and circumstances lawful in themselves and consistent with an honest purpose. If, when all the facts and circumstances are taken together, they are consistent with an honest intent, proof of fraud is wanting." *Dunlap v. Seattle Nat. Bank,* 93 Wash. 568, 161 Pac. 364.

We are unable to hold that Orino breached his contract to furnish financial assistance to the appellant

during the progress of the work. Appellant did demand that Orino supply him with ten thousand dollars to assist in paying bills. An examination of the record discloses that appellant did not need a sum in excess of five thousand dollars, and further that Orino did not definitely refuse to furnish the money necessary, but sent a letter to appellant in which he made a qualified denial of the request, which letter was not answered by appellant. The contract was subsequently finished without the loan of any money by Orino. Moreover, under our decisions, a failure of consideration or a breach of a contract, unless it is substantial, is not ground for rescission, but only a basis for the recovery of damages. *Robinson v. Puget Electric Welding Co.*, 162 Wash. 626, 299 Pac. 405; *Capital Sav. & Loan Ass'n v. Convey*, 175 Wash. 224, 27 P. (2d) 136; *Rozzano v. Moore*, 175 Wash. 566, 27 P. (2d) 1096.

Appellant maintains that Orino's cross-complaint does not state a cause of action, in that the contract upon which it was based shows a lack of consideration. Having in mind, however, the size of the contract and apparent chance of failure to perform it without loss, we feel that there was sufficient consideration to support the contract.

Error is predicated upon the court's admission of certain evidence objected to by counsel. We have examined that evidence and find the error, if it was error, was either cured by subsequent testimony or was not considered by the trial court in making his decision.

In an equitable action:

". . . the court ultimately will consider only such facts and pleadings as the circumstances seem to require and will cast aside the remainder as superfluous." *Hillman v. Gordon,* 126 Wash. 614, 219 Pac. 46.

Another ruling complained of was the refusal of the trial court to admit certain testimony and exhibits offered by counsel for appellant.

Lacey V. Murrow, director of highways of the state of Washington, qualified as an expert to testify from an engineering standpoint and was asked to draw certain conclusions as to whether or not the bid made by appellant was safe and in line, or hazardous and out of line. The testimony was objected to on the ground that the witness had not been qualified as an expert to answer this question, and the court sustained the objection. We see no error in this ruling.

Examination of other assignments of error concerning admission of testimony convinces us that they are without merit, especially in view of our conclusions concerning appellant's claims of custom, fraud, and business compulsion.

The trial court, evidently having in mind the rules of evidence relating to fraud cases, was very liberal in allowing evidence to be produced. Every opportunity was afforded appellant to submit proof of all matters directly or indirectly affecting or bearing upon the case. We are convinced that his decision was correct in every particular.

The judgment is affirmed.

STEINERT, C. J., MAIN, HOLCOMB, and GERAGHTY, JJ., concur.