[No. 28614.   Department One.   June 4, 1942.]

CENTRAL LIFE ASSURANCE SOCIETY, *Appellant,* v. ELSIE IMPELMANS, *Respondent.*[1]

[1]Reported in 126 P. (2d) 757.

*Tustin & Chandler,* for appellant.

*Edward M. Connelly* and *Connelly & Close,* for respondent.

STEINERT, J.—Plaintiff brought suit to forfeit a real estate contract and to recover possession of the property described therein. Defendant answered, denying the material allegations of the complaint, and by cross-complaint sought rescission of the contract and recovery of all sums which she had theretofore expended in connection with the purchase of the property. Upon a trial without a jury, the court entered a decree denying plaintiff's prayer for forfeiture, adjudging that the contract be rescinded, and directing that the defendant

recover from the plaintiff a specified total amount including her payments on the contract price, her expenditures for taxes, insurance, and improvements, and the sum of $3,260 which defendant had previously paid to a third party for his equity in the property, together with interest on all these items. The plaintiff was granted an allowance for the rental value of the premises while in the defendant's possession, to be set off against the interest item allowed to the defendant. Plaintiff has appealed.

Appellant, Central Life Assurance Society, is a corporation having its home office in Des Moines, Iowa, and is qualified to do business in this state, where it invests funds in real estate mortgages. In such matters, it is represented in Spokane by the firm of Murphey, Favre & Co. In 1935, appellant acquired the property here involved through the foreclosure of a mortgage which had been executed about ten years before. On or about December 17, 1936, appellant entered into a written contract agreeing to sell the property to one Mae Sims. This contract, which is the one involved in this litigation, described the property as being

"Lot three (3) in Block thirty-three (33) of Stratton's Addition to Spokane Falls (now Spokane) in the City of Spokane; ALSO a strip West of said Lot three (3) more particularly described as follows:

"BEGINNING at the Northwest corner of said Lot three (3) thence South along the West line of said Lot, fifty-eight (58) feet; thence West to the East line of Bingaman's Addition; thence North along the East line of Bingaman's Addition, fifty-eight (58) feet; thence East to the place of beginning; ALSO

"Lots one (1) and two (2) except the North one hundred eight (108.5) and one-half feet thereof in Block Sixteen (16) of Bingaman's Addition to Spokane Falls (now Spokane) in the City of Spokane."

The present appeal concerns particularly the fifty-eight foot strip referred to in the second paragraph of the above description. The map which follows will contribute to a clearer understanding of the issues here presented.

The heavily shaded lines on the map mark the boundaries of the property covered by the contract. Lot three in block thirty-three of Stratton's Addition fronts on Monroe street, between Sharpe avenue and Boone avenue, and is improved with a brick apartment building containing twelve four-room apartments. Lots one and two in block sixteen of Bingaman's Addition lie west, and in the rear, of the apartment building and front on Sharpe avenue, between Monroe street and Madison street. The southerly thirty-three and a half feet of these latter two lots (being the only portion thereof with which we are here concerned) front south on a sixteen-foot alley which runs east and west through block sixteen of Bingaman's Addition from

Madison street to the east line of that addition. Upon this southerly portion of these two lots are a number of garages which serve the apartment building on lot three in block thirty-three of Stratton's Addition.

Between block thirty-three of Stratton's Addition and block sixteen of Bingaman's Addition is a narrow, triangular-shaped parcel of unplatted ground which has a width of about nine feet at the margin of Sharpe avenue, on the north, diminishes progressively to a width of four or four and a half feet at the center of the alley above mentioned, and disappears entirely in the southerly portions of the two blocks. Apparently this strip of ground was left unplatted as the result of an error in the survey of one or both of the additions, for otherwise these additions would have been contiguous throughout from Sharpe avenue to Boone avenue. The dividing line between lots three and four in block thirty-three would, if extended west, bisect the sixteen-foot alley across block sixteen. Lot four of block thirty-three is owned by one O. F. Smith.

It is undisputed that for thirty or forty years last past that portion of the strip of unplatted ground lying between the east end of the alley and the west line of block thirty-three, and which has a width, in that area, of only about four feet, has been used simply as a means of passage between the end of the alley and the property to the east of it and has in fact been regarded as a part of the alley itself extended to the property line of block thirty-three. Appellant concedes that it holds only an undivided one-half interest in the fee of this sixteen-foot segment of the unplatted strip, the other half interest belonging to the above-mentioned O. F. Smith. Appellant therefore admits that it is unable to convey a fee title to that portion of the property described in its contract.

Prior to its transaction with the above-mentioned Mae Sims, appellant had, on June 22, 1936, entered into a similar written contract for the sale of the property, as above described, to one G. W. Reimers for the sum of nine thousand dollars, payable fifteen hundred dollars in cash, and the balance in semiannual installments of two hundred fifty dollars each. That contract contained a provision which reads:

"Upon full compliance by second party [Reimers] with all of the terms and conditions hereof, first party [Central Life Assurance Society] will convey said real estate to second party by *good and sufficient special warranty deed,* and with such deed, will deliver an abstract of title or policy of title insurance, showing title *good in fact and insurable,* extended to the date of this contract." (Italics ours.)

Reimers entered into possession of the property and operated the apartments until some time in December, 1936. In the meantime he had decided to resell the property and had listed it with a number of real estate agents. Respondent inspected the premises but thought that the price which Reimers was asking was excessive. She therefore sent her friend, Mae Sims, to pose as a prospective purchaser, and, after inspecting the property several times, Mrs. Sims agreed to purchase Reimers' interest therein for $3,260. Reimers signed a contract to that effect, but it is not clear whether or not Mrs. Sims also signed it.

For the purpose of completing that transaction, and at the suggestion of Mrs. Sims, the parties then repaired to the office of Murphey, Favre & Co., which represented appellant in connection with the latter's contract with Reimers. Murphey, Favre & Co. had had no previous connection with the transaction between Reimers and Mrs. Sims, but at Reimers' request they agreed to release him from his contract upon comple-

tion of the sale to Mrs. Sims and thereupon requested their attorneys, Tustin & Chandler, to draw a contract of sale directly between appellant, as seller, and Mrs. Sims, as purchaser. The contract was drawn and was submitted to Mrs. Sims' attorney, who thereafter wrote to his client suggesting certain changes in the contract, some of which were accepted and some rejected by Murphey, Favre & Co. The latter's attorneys then redrafted the contract, which was signed by appellant and by Mrs. Sims on or about December 17, 1936.

The sale price, as stated in this contract, was seventy-five hundred dollars. Mrs. Sims paid five hundred dollars thereof at the time of the execution of the contract and agreed to pay the balance in monthly installments of eighty dollars each. She also agreed to pay all subsequent taxes before delinquency. In consideration of these undertakings on her part, the appellant agreed that:

"Upon full compliance by second party [Mae Sims] with all of the terms and conditions thereof, first party [Central Life Assurance Society] will convey said real estate to second party by *good and sufficient special warranty deed,* and with such deed, will deliver to second party the abstract and title policy now held by it covering the above described real estate. Said abstract and title policy have been submitted to second party and the title established therein is accepted by second party." (Italics ours.)

In addition to the amount Mrs. Sims thus agreed to pay appellant, she had theretofore obligated herself to pay Reimers $3,260 for his equity in the property, so that she was to pay a total of $10,760 for the full ownership thereof. This was $1,760 more than Reimers had agreed to pay for the property under his contract with appellant, the difference in price representing the value of furniture Reimers had installed in the apartments, his profit on the transaction, and the real

estate brokers' commissions incidental thereto. Mrs. Sims deposited the $3,260 with Murphey, Favre & Co. and the latter subsequently distributed it to, or for the benefit of, Reimers. Murphey, Favre & Co. received no fees or other compensation for their services in connection with the entire transaction.

At the time of the sale by appellant to Mrs. Sims, the title to the land in Bingaman's Addition was evidenced by a policy of title insurance, while the title to the unplatted strip and to the lot in Stratton's Addition was evidenced by an abstract of title. Respondent testified that she understood that the abstract was submitted by Mrs. Sims to an attorney, but the record does not disclose whether or not the policy of title insurance was also submitted to him.

On December 18, 1936, Mrs. Sims assigned all her interest in the contract, and in the real estate covered thereby, to respondent, Elsie Impelmans, who accepted the assignment and agreed to assume all of Mrs. Sims' obligations under that contract. It is admitted that in all these transactions Mrs. Sims was acting for Mrs. Impelmans, who supplied all the money paid to Reimers, as well as the down payment provided for in Mrs. Sims' contract with appellant. Mrs. Impelmans testified that she had used Mrs. Sims simply in an endeavor to obtain from Reimers a lower price for his interest in the property.

Respondent went into possession of the property in January, 1937, and paid the installments due under the contract up to and including September, 1939, and until that time no difficulty appears to have arisen between the parties to this action. In January, 1940, Mrs. Impelmans began negotiations with one F. F. Funk for a loan from him of $5,400, with which she intended to pay up the contract in full. Mr. Funk agreed to make the loan, and deposited withdrawal slips

against two Spokane banks in that total sum with the Spokane Title Company as escrow holder. As part of that transaction, Mrs. Impelmans agreed to furnish Mr. Funk with a policy of title insurance covering the entire property. Pursuant to this undertaking, the abstract of title covering the unplatted strip and the lot in Stratton's Addition was turned over to the title company. After making investigation, the latter reported to respondent that it would insure title to all of the property described in the contract except the south sixteen feet of the unplatted strip, which is the area lying between the west line of block thirty-three of Stratton's Addition and the eastern terminus of the sixteen-foot alley running through block sixteen in Bingaman's Addition. It refused to insure title to that segment of the unplatted strip because, as has already been mentioned, O. F. Smith owns an undivided half interest therein. It should be noted, however, that there has never been any interference by anyone with respondent's use of this portion of the strip for the purposes to which it has always been devoted.

When Mr. Funk was advised of the condition of the title he agreed to make the loan regardless of the reported defect. Respondent, however, was not satisfied with that disposition of the matter. In the early part of February, 1940, Mr. M. J. Luby, an attorney representing Mrs. Impelmans, wrote to Mr. Chandler, appellant's attorney, suggesting that a quitclaim deed to the strip in question be obtained from O. F. Smith and his wife and stating that Mrs. Impelmans had said that she would insist that she be given good title to the sixteen-foot strip. After a number of conferences, participated in by the two attorneys, the title company, and Mr. Smith, a tripartite agreement was drawn whereby Mrs. Impelmans and the Smiths were, in

effect, to dedicate this segment of the unplatted strip as a part of the alley and each was to quitclaim to the other the fee of so much of that segment as abutted upon the other's lot. Mr. Smith announced that he would execute the proposed agreement, and the title company agreed to insure title subject thereto. Respondent, however, refused to sign the instrument. Instead, she and her real estate agent apparently endeavored to purchase from Mr. Smith and his wife all, or a part of, their interest in the entire sixteen-foot strip. Mr. Smith refused to sell, on the ground that such sale might shut him off entirely from the alley.

Another attorney, who officed with respondent's real estate agent, then wrote to appellant at its home office in Des Moines, Iowa, demanding rescission of the contract. That attorney also had a conference with Mr. Chandler, and was shown the proposed tripartite agreement which Smith had agreed to execute, but which respondent had refused to sign. The attorney expressed the opinion that the agreement should be satisfactory to respondent, but said that he did not know how she would react to it. Respondent denied, upon the trial, that this attorney had any authority to represent her. At any rate, she persisted in her refusal to sign the agreement.

About this time also, Mr. Nevers, president of Murphey, Favre & Co., called on respondent and, after discussing the matter with her, told her that his firm would do everything it could to clear the title. However, since respondent would accept nothing less than a quitclaim deed from Smith and his wife, and since Smith was unwilling to give such a deed, there was nothing further that appellant or its attorneys could do with reference to the title, and respondent was so advised, at least indirectly.

On March 6, 1940, respondent sent a letter, of which a copy was forwarded to appellant's counsel, notifying Funk that she was unable to get the title called for in her contract, and that she therefore would not need the money he had agreed to lend her. Funk thereupon withdrew the money, and the mortgage negotiations terminated.

In the meantime, respondent had not been paying the installments accruing on the contract after September, 1939, nor had she paid certain taxes which her contract required her to pay. Accordingly, on April 1, 1940, appellant caused to be served upon her a notice, as provided in the contract, reciting that she was in default in her monthly payments and advising her that unless the default were cured within thirty days the contract would be forfeited. During this thirty-day period, other attorneys representing respondent called on Mr. Chandler and the situation was explained to them. Later, one of these attorneys notified Mr. Chandler that respondent would pay up the delinquencies and asked that no snap judgment be taken against her. On May 1, 1940, respondent paid appellant four hundred eighty dollars, placing the contract in good standing as of April 1.

On or about July 1, 1940, respondent entered into a written escrow agreement with one Walter R. Sheldon and his wife, for the exchange of the property here involved for similar property owned by the Sheldons. Among other things, that agreement recited:

"It is also understood, in connection with LaSalle [sic] Apartment property, that there is a narrow pointed piece of land, between the Apartment property and the garages belonging thereto, which strip of ground there is no title thereto and that this proposition is also accepted subject to same being true."

For some reason or other, however, this exchange of properties was never consummated.

After making the payment on May 1, 1940, respondent never again discussed the matter of title with anyone representing appellant. She remained delinquent in the payment of the taxes referred to above and also failed to make further installment payments as they fell due. On July 13, 1940, therefore, appellant again sent her notice of intention to forfeit the contract unless these delinquencies should be corrected within thirty days. On August 15, 1940, in response to that notice, respondent tendered to Murphey, Favre & Co. the sum of one hundred sixty dollars, which, however, did not cover the full amount then owing by her. She was therefore given a receipt indicating that the amount tendered was accepted subject to the approval of appellant's attorneys. Thereafter, respondent telephoned to Mr. Chandler and discussed with him the matter of the delinquent taxes, stating that she was going to Lewiston, Idaho, to attend to some business, but that upon her return she would again talk with him about that matter. During the period covered by the second notice of forfeiture, respondent had negotiations with several other people for the sale of the apartment house property, but nothing came of those negotiations.

On August 26, 1940, after her return from Lewiston, respondent, through another attorney, wrote to appellant and Murphey, Favre & Co., notifying them that she had elected to rescind the contract and demanding the return of all moneys paid by her as well as compensation for the improvements she had made on the premises. On receipt of that letter, Murphey, Favre & Co. returned to respondent the one hundred sixty dollars which they had accepted conditionally, and on August 29 their counsel caused a final notice of for-

feiture to be served upon her, demanding surrender of the premises by her. Upon her failure to comply with the demand, appellant instituted the present action.

While the appellant, in its brief, makes five assignments of error, our view of the case requires the consideration of but two of them. These two assignments are that the court erred (1) in refusing to grant appellant a decree forfeiting the contract, and (2) in entering a decree of rescission in favor of respondent. We shall discuss these two assignments in inverse order.

■ Although respondent in her answer and cross-complaint alleged the existence of a defect of title to the entire fifty-eight foot unplatted strip described in her contract, the only defect relied upon by her at any time prior to the commencement of this action related merely to that portion of the strip, sixteen feet in length, which lies opposite the east end of the alley through block sixteen in Bingaman's Addition. Upon the trial, however, respondent contended that title to the entire fifty-eight feet of the unplatted strip was defective for the reason that no proceedings for the probate of the estate of Howard W. Stratton, who died in 1895, were shown of record. Whether or not Stratton was ever the owner of the unplatted strip would depend upon whether that strip was contained in his patent or whether it was contained in the patent to the land from which Bingaman's Addition was subsequently platted. But whatever may have been the situation in that respect, the title to the portion of the strip north of the alley was conveyed to appellant's predecessors in interest as early as 1904 by Bingaman and his wife, acting jointly with the grantees of certain of Stratton's heirs. While it is true that Stratton's estate was never probated, it appears from the record

herein that his estate was settled out of court and his property divided among his heirs. Although the record does not definitely show that this unplatted strip was allocated, upon such division, to those of his heirs from whom the appellant's record title to the north forty-two feet of the segment abutting upon lot three is derived, still it seems certain that there is now no danger of the assertion of any claim hostile to that title. In witness of this the Spokane Title Company has at all times expressed its willingness to insure the title to all of the strip here involved except the south sixteen feet, so that respondent would be perfectly safe in accepting title to the portion north of the alley. It would therefore appear that as to this portion of the unplatted strip there is no real defect in appellant's title.

With respect to that portion of the strip' which formed an extension of the alley, comprising an area sixteen feet by four or four and a half feet, it is true that appellant owned only an undivided one-half interest therein. However, it is to be remembered that appellant by its contract did not agree to convey the property to respondent by general warranty deed, but only to "convey said real estate to second party by good and sufficient special warranty deed."

A covenant of special warranty is one the operation of which is limited or restricted to certain persons or claims. 7 Thompson, Real Property (Perm. ed. 1940) 216, § 3741; 21 C. J. S. 920, Covenants, § 49. A special warranty deed, therefore, normally warrants title only against claims held by, through, or under the grantor, or against incumbrances made or suffered by him, and it cannot be held to warrant title generally against all persons. *Buckner v. Street* (C. C. Ark.), 15 Fed. 365; *Reeves v. Wisconsin & Arkansas Lbr. Co.*, 184 Ark. 254, 42 S. W. (2d) 11; *Burton v. Price*, 105 Fla. 544, 141 So.

728; *Kentucky River Coal Corp. v. Swift Coal & Timber Co.*, 221 Ky. 593, 299 S. W. 201; *Wempe v. Schoentag*, 163 Md. 647, 163 Atl. 868; *Raymond v. Raymond*, 10 Cush. (64 Mass.) 134; *Jones v. Metzger*, 132 Miss. 247, 96 So. 161; 7 Thompson, Real Property (Perm. ed. 1940) 216, § 3741; 4 Tiffany, Real Property (3d ed. 1939) 127, § 999; 21 C. J. S. 920, Covenants, § 49. See, also, *Collins v. Hoffman*, 74 Wash. 264, 133 Pac. 450; *Dothan Nat. Bank v. Hollis*, 212 Ala. 628, 103 So. 589; *Miller v. Bayless*, 101 Mo. App. 487, 74 S. W. 648, affirmed, 194 Mo. 630, 92 S. W. 482. A special warranty deed therefore protects the grantee against a claim under a title *from* his grantor, but not against a claim under a title *against*, or superior to, his grantor. *Kentucky River Coal Corp. v. Swift Coal & Timber Co., supra; Gittings v. Worthington*, 67 Md. 139, 9 Atl. 228.

By the express provisions of the contract, respondent was put upon notice as to the kind of title that she was to receive. The contract was submitted to an attorney by Mrs. Sims, who was respondent's admitted agent. Furthermore, the abstract of title, which respondent believed was submitted to the same attorney and which was at all times available to respondent, revealed the state of the title to the unplatted strip. The parties having voluntarily entered into a contract containing a provision as to the character of title that was to be conveyed, and no fraud being here shown, both parties are bound by the terms of their contract; and, by the same logic, each party is entitled to rely upon the provisions of that agreement. The defect of title, if there was any defect, was not created by appellant. It had obtained the property under mortgage foreclosure proceedings, and, for that reason, evidently did not wish to warrant the title generally. If respondent did not care to accept a contract calling only for conveyance by special warranty deed, she was not com-

pelled to buy the property. Having bought it under those conditions, she may not now demand more than that to which the contract entitled her.

Assuming, however, for the sake of argument, that respondent may have been entitled originally to a rescission of the contract because of the alleged defect of title, the facts above outlined establish that she waived that right. With full knowledge of the exact situation brought home to her, and after the matter had come to an impasse by reason of the inability of appellant to remedy the alleged defect, she twice made voluntary payments to apply upon the contract. She also repeatedly endeavored to sell the property. By these acts she treated the contract as though it were in full force. The rule in such situations is, as stated in 66 C. J. 831, Vendor and Purchaser, § 489, that

"Any act on the part of the purchaser treating the contract as in force, when done voluntarily and with a knowledge of facts creating a right to rescind, amounts to a waiver of the right to rescind because of the existence of such facts. However, the acts evincing an intention to waive the right to rescind must be distinct and unequivocal, as, for example, by continuing negotiations after breach by the vendor on the basis of the continued existence of the contract; *or by making or promising to make payments* of the purchase money thereunder; . . . " (Italics ours.)

This court has many times held that one who seeks to avoid a contract which he has been induced to enter into by the fraudulent representations of another touching the subject matter of the contract must act with reasonable promptness on discovering the fraud, otherwise the right to rescind will be waived. *Weir v. School Dist. No. 201,* 200 Wash. 172, 93 P. (2d) 308, 123 A. L. R. 1057, and cases therein cited. If, then, a contract may not be avoided for fraud unless prompt action be taken, much less can it be avoided in a case such as

this, where not only is there no showing of fraud, but the complaining party has actually continued to treat the contract as if it were still in full force. These considerations serve as additional grounds for holding that respondent is not entitled to a rescission of the contract.

There is yet another, somewhat different, ground upon which our decision in this case may be rested, regardless of the conclusions heretofore stated. The strip of ground here in question is not only inconsiderable in comparison to the whole property covered by the contract, but it has for thirty or forty years been constantly used simply as a passageway between the apartment house and the alley, and it could be used for nothing else. In fact, such long, continuous use by the public, as well as by the abutting property owners, has probably served to make it legally, as well as practically, a part of the alley. No amount of title could increase, nor could any absence of title diminish, the respondent's right to use this strip for the only purposes for which it has customarily been used. Were she to obtain a fee simple title thereto, she could merely continue to use it for those same purposes, nor would there be any occasion for her to wish for more than that. At the time she took the assignment of the contract here involved she knew, or should have known, the uses to which this portion of the property had theretofore been devoted. She has therefore failed to prove more than nominal damage by reason of appellant's inability to convey a full title in fee to all the property described in its contract.

But even if respondent should suffer damages by reason of a failure of consideration in this respect, any such damage would be fully compensable by the allowance of a proportionate abatement of the purchase price. To rescind the contract in its entirety for such

inconsequential damage would, in our opinion, be grossly inequitable. The rule to be followed in such cases, as stated in 39 Cyc. 1408 (66 C. J. 803, Vendor and Purchaser, § 435) and quoted in *Mast v. Hoover*, 126 Wash. 148, 217 Pac. 718, is as follows:

"If the part to which the failure of title appertains is small or inconsiderable in comparison with the whole, and does not affect the value and reasonable enjoyment of the remainder for the purposes for which it was intended, and is susceptible of compensation, the purchaser will not be permitted to rescind, although he will be entitled to a proportionate abatement from the price."

The same rule is again stated in *Capital Savings & Loan Ass'n v. Convey*, 175 Wash. 224, 27 P. (2d) 136. Accord, *Marrazzo v. Orino*, 194 Wash. 364, 78 P. (2d) 181. We conclude, therefore, upon all these grounds, that respondent is not entitled to a decree of rescission.

This leaves for consideration appellant's contention that it is entitled to a decree confirming its forfeiture of the contract. We are not inclined to take that view. Respondent has paid on the purchase price of the property over sixty-eight hundred dollars, including principal and interest on the contract and the initial payment to Reimers. Her contentions with respect to her right of rescission, though not legally well grounded, are not altogether without reason. Forfeitures are not favored in the law and will not be enforced when it clearly appears that it would be inequitable to do so. Particularly is this true when the case is capable of disposition in a manner which will adequately protect all the parties concerned. With that end in view, we have reached this conclusion: Respondent shall have ten days from the date of the remittitur herein within which to elect, in writing, whether she will pay in full the amount then owing

under the terms of the contract. If she so elects, she shall pay the appellant one hundred sixty dollars at the time of such election, to be applied to the payment of the two installments longest, delinquent, and thereafter, within thirty days from the date of such election, shall pay the balance then due and owing on the contract. If, however, she fails to make such election or to make such payments, the appellant shall be entitled to a decree forfeiting the contract and quieting its title to the property as against any claim or interest of the respondent.

The decree of the trial court is reversed with direction that further proceedings be had not inconsistent with the views herein expressed.

ROBINSON, C. J., MAIN, MILLARD, and DRIVER, JJ., concur.

'Reported in 126 P. (2d) 591.