[No. 32188. Department Two. March 25, 1953.]

FLORENCE C. MATHEWS, *Respondent*, v. RICHARD P. HEISER, *Appellant*.[1]

[1]Reported in 255 P. (2d) 366.

*Elliott, Lee & Thomas,* for appellant.

*Leo W. Stewart,* for respondent.

HILL, J.—This is an appeal from a judgment which, in effect, holds that the plaintiff was entitled to and did rescind an exchange agreement and is entitled to recover a down payment of five thousand dollars made thereon, together with an item of $229.43 claimed to be the excess of the plaintiff's expenditures over her receipts while acting as caretaker of the defendant's property after the rescission.

Since we conclude that the evidence does not sustain some of the trial court's findings, and since we are not in accord with the basic conclusions drawn from the facts by the trial court, a statement sufficiently detailed to make clear the reasons for our disagreement is indicated.

June 26, 1950, Richard P. Heiser and Frank R. Mathews and Florence C. Mathews, his wife, executed the exchange agreement with which we are here concerned. The Heiser property involved was known as Heiser's Resort on Shadow Lake and consisted of about thirty-three acres with twelve hundred feet of frontage on the lake, being part of a 180-acre tract owned by Heiser. The valuation placed on the resort property for the purpose of the exchange was seventy thousand dollars. The Mathews property involved consisted of cash in the amount of five thousand dollars and three and one-half city lots, on which a valuation of fifteen thousand dollars was placed for the purpose of the exchange. The receipt given by Heiser for the cash payment stated that it was "payment on purchase price of Heiser's Resort." The difference of fifty thousand dollars was to be paid in monthly payments of three hundred dollars or more (including interest at the rate of four per cent per annum on deferred payments), payments to begin August 1, 1950, and to be made on the first of each month thereafter until the full amount had been paid.

It was necessary that a survey be made to segregate the resort property from the rest of the Heiser property, which will hereinafter be referred to as "the farm" to distinguish it from the resort.

Mr. and Mrs. Mathews went into possession of the resort property July 1, 1950.

There were several houses on the farm, and, as an entirely separate transaction, Mr. and Mrs. Mathews—and after his death Mrs. Mathews alone—rented the farm from Heiser on a month-to-month tenancy, which continued from August 1, 1950, to March 15, 1951.

Mr. Mathews was not well when the exchange agreement was executed, and died October 28, 1950. Mrs. Mathews was a former school teacher and a businesswoman of considerable experience, and was at all times the moving figure on the Mathews' side of the transaction. After her husband's death, she continued to operate the resort and rent the farm. She made the three-hundred-dollar payments called for by the exchange agreement for five months, August through December, 1950. (In her pleadings she alleged that these payments were for the use and benefit of the property, with the oral understanding that the payments would apply on the purchase price if the transaction was finally consummated.)

The survey was completed September 18, 1950, and on the 19th Heiser made application for title insurance. It appears that on the date of the exchange agreement Heiser's title was free of liens and encumbrances, but legal difficulties began to plague him shortly thereafter, arising out of the situation set forth in our opinions in the case of *Salter v. Heiser,* which has twice been before this court (36 Wn. (2d) 536, 219 P. (2d) 574 (1950); 39 Wn. (2d) 826, 239 P. (2d) 327 (1951)). At the expiration of ninety days from the date of the exchange agreement (the term allowed by the agreement for procuring good title), there was a judgment lien for $661.47 on all of his property. Although this was paid October 16, 1950, there was, at the time of the title report of October 31, 1950, an attachment which covered all of the property. That title report also raised the question of whether Heiser's divorced wife had an interest in the property, but the latter question was quickly eliminated by securing a quitclaim deed from the former wife. The case in which the attachment had been issued went to trial on December 14, 1950, and resulted in a judgment against Heiser, entered January 16, 1951. The case was appealed

to this court, but the judgment was, of course, a lien against his property, and his efforts were thereafter devoted to obtaining a loan which would make it possible to supersede that judgment and thus clear his title.

Anticipating that Mrs. Mathews would be willing to join in the execution of a mortgage, Heiser made application for a loan of seven thousand dollars, later raised to twelve thousand dollars, to be secured by a mortgage on both the resort and the farm property. Mrs. Mathews did not make her December payment on the exchange agreement until about the fifteenth of the month. Heiser left for California on December 16th or 17th, but talked with Mrs. Mathews before he left. Her testimony concerning their conversation in December follows:

"Q. Did you talk to him during the month of December at all? A. Yes, I did. I talked to him at the time I gave him a payment, and he said that the title insurance would be out. Then I talked to him, oh, I don't know whether it was by 'phone along the 16th or so, or whether it was out at the resort, but I talked to him. It was, I think, that *we both thought that the matter would be settled shortly.* Q. Did he talk to you about Carrol Hedlund at that time? A. Yes, he did. Q. What did he say about them? A. He told me he was arranging for a mortgage on the property. Q. What did he want you to do? A. He wanted me to sign a mortgage note, or a note, or something in conjunction with him. Q. Now, what did you do about it? A. I told him at that time that I would have to know more about it before I could possibly consider such a thing." (Italics ours.)

At that time, Heiser had no assurance that Mrs. Mathews would join in the mortgage, but she had not refused.

She left for Minneapolis on December 18th and returned Christmas day. Heiser's application for a twelve-thousand-dollar loan was approved December 27th, by a mortgage loan company, and as late as January 3, 1951, Mrs. Mathews told a representative of that company that she would sign a mortgage if her interest would not be jeopardized thereby.

The first indication of any dissatisfaction on her part over Heiser's delay in furnishing a clear title or with any phase of the transaction was a few days before January 10,

1951, probably January 6th, when she went to the office of Heiser's attorney and indicated that she would not sign a mortgage to assist Heiser in securing the loan, and that she was dissatisfied because he had not been able to give her evidence of good title.

On January 10th, Mrs. Mathews, accompanied by Knute Holm, a personal friend and adviser, went to the office of Heiser's attorney and announced that she was through with the transaction and wanted her five thousand dollars back, but that she was willing to stay on the premises and continue to operate the resort until Heiser's return from California.

Heiser, upon being informed of Mrs. Mathews' attitude by telegraph and telephone calls from his attorney, returned from California and succeeded in securing a sufficient loan on the farm property alone to supersede the judgment in *Salter v. Heiser, supra,* and thus free the resort property of all liens. The money for that purpose was delivered by the mortgage loan company to the title insurance company February 13, 1951. The title insurance company issued a title report dated February 19th, showing Heiser's title to the resort property to be free and clear of liens and encumbrances. This was delivered to Mrs. Mathews' place of business in the late afternoon of February 20th, and it is conceded that she received it prior to her meeting with Heiser on February 21st.

The title report was accompanied by a letter asking that she procure title insurance on her lots by March 1, 1951, but suggesting that a reasonable extension of time beyond that date could be agreed upon if necessary. The letter also referred to an enclosed copy of a real-estate contract which would provide for delivery of the deed to the resort property when all the money due Heiser under the exchange agreement had been paid. The propriety of the request that Mrs. Mathews execute such a contract will be hereinafter discussed.

It is conceded that Mrs. Mathews never asked for and never did procure title insurance or a title report on her lots. On February 21st, Heiser went to the resort property (see

her notice that she was quitting the premises that day, quoted below) and there accepted the keys from Mrs. Mathews and resumed possession of the property. However, he did not acquiesce in the rescission which she was asserting, and made it clear that his position was that she was abandoning the property.

Although Mrs. Mathews continued to occupy the farm until March 15th under her month-to-month tenancy, no further effort was made toward carrying out the exchange agreement. Mr. Heiser thereafter, on June 14, 1951, sold the resort property to Harold Wells Grant and his wife for fifty-six thousand dollars.

This action was commenced by Mrs. Mathews to recover the five thousand dollars which she paid on June 26, 1950, and the $229.43 she alleged to be the balance due her as excess of her expenses over receipts for the period from January 1, 1951, to February 21, 1951, during which time she asserts she was in possession of the resort property as caretaker for Heiser.

Heiser cross-complained for damages as a result of the breach of the exchange agreement by Mrs. Mathews.

The critical question in this controversy is, Did Mrs. Mathews have a right, on January 10, 1951, to rescind the exchange agreement forthwith because of Mr. Heiser's failure to furnish her with title insurance?

The pertinent provisions of the contract are:

"5. The parties agree within ten days or as soon as procurable from the date hereof to procure from Washington Title Insurance Company purchaser's policies of title insurance, insuring the full amounts of the contract valuations, against loss or damage by reason of defect in the titles to said described premises, or by reason of prior liens not assumed under this contract.

"6. If the title to either, or both, of said properties is not good or cannot be made good within ninety days from date hereof, then this agreement except the provisions concerning commissions shall be void, provided that either party may elect to take the title of the other party as it is, and in such case the other party shall convey as agreed, provided that written notice of such election shall be given personally

or by registered mail prior to the expiration of said ninety days, said party also tendering performance. . . .

"8. Each conveyance shall be a warranty deed conveying the respective properties free of incumbrances except as herein stated, and those created or suffered by the act or default of the other party."

There can be no question but that ninety days from the date of the exchange agreement there was a cloud on the Heiser title. However, it is established that after the expiration of the ninety-day limitation, Mrs. Mathews made the October, November, and December payments provided for in the exchange agreement, knowing that Heiser was continuing his efforts to raise the money needed to clear his title. She concedes that she remained in possession of and operated the resort until January 1, 1951, under the exchange agreement. Such clear and unequivocal conduct on her part established a waiver of the ninety-day limitation in paragraph 6, *supra*. *Gillmore v. Green*, 39 Wn. (2d) 431, 235 P. (2d) 998 (1951), and cases there cited. (In that case we quoted and approved the rule applicable to such situations laid down in *Central Life Assur. Society v. Impelmans*, 13 Wn. (2d) 632, 126 P. (2d) 757 (1942). The rule as there stated was taken from 66 C. J. 831, Vendor and Purchaser, § 489.)

Mrs. Mathews having waived the ninety-day limitation for securing good title, the rule is that, before she could avail herself of Heiser's failure to deliver good title as the basis for a rescission of the exchange agreement, she was obligated to demand of him a compliance with that agreement, and to allow a reasonable time for him to comply with the demand. *Opsjon v. Engebo*, 73 Wash. 324, 131 Pac. 1146 (1913), and cases there cited. (The rule as stated in that case was quoted in *Garrison v. Newton*, 96 Wash. 284, 294, 165 Pac. 90, 4 A. L. R. 804 (1917).) This she never did, but instead announced to Heiser's attorney on January 10th, knowing that Heiser was in California at that time, that she was through and wanted her five thousand dollars back. This she contends was rescission.

She took a somewhat different position in the notice she

caused to be served February 19, 1951, after Heiser had returned to Seattle, which read as follows:

"You Will Please Take Notice, that the Exchange Agreement entered into between yourself and Frank R. Mathews and Florence C. Mathews, his wife, on June 26, 1950, has long since been void by its terms, in that you have failed to deliver proper title within the ninety day period, and the party of the second part does not elect to take said title as it now stands or have they during the period of ninety days according to the terms of said exchange contract, ever elected to take the same.

"Further this is to notify you that the undersigned will not remain in the premises known as Heiser Shadow Lake from and after Wednesday, February 21, 1951, or be responsible for the same. That the rents collected for the months of January and February, 1951, by the undersigned are as follows:

$302.50
Less expense $531.93
Balance Due Me $229.43

That said balance to be added to the $5000.00 down payment which was made by the parties of the second part on the signing of exchange agreement, and which is now due and owing to the undersigned; that the balance of the said down payment in the sum of $5229.43 is also now due and this is a demand upon you to pay the same.

"Dated this 15th day of February, 1951.

"Florence C. Mathews [signed]"

■ The trial court's finding of fact that, when Heiser took possession of the property from Mrs. Mathews he "rescinded, annulled and cancelled the exchange agreement," is not supported by the evidence; and if it be considered as a conclusion of law, it does not follow from the facts as established by the evidence. Mrs. Mathews herself testified that Heiser told her that it was his position that she was abandoning the property.

■ Nor can we accept the trial court's finding that the payments of three hundred dollars a month were for rent of the premises. It is contradicted by the express terms of the receipts which Mrs. Mathews received for the payments, each of which stated that it was a "payment on Resort Contract" and some of which contained the words "including

interest." (And she knew a rent receipt when she saw one, because she was getting one each month for the rent she was paying for the farm.) It is further contradicted by the changes she made, including the change of name to Jamie's Shadow Lake Resort, and by the evidence that she held herself out as its owner. The evidence that the payments were made on the contract was so conclusive that she asked leave to amend her complaint to allege that the five payments in question were made on the contract and not as rent. Leave to amend was not granted, but that does not change the effect of the evidence. We have no hesitancy in holding that the finding referred to is not supported by credible evidence.

Applying the generally recognized rules of law heretofore set forth to the conduct of the parties, we conclude that, the time limitation clause in the exchange agreement having been waived, Mrs. Mathews had no right of unconditional rescission on January 10th, although she could have demanded that Heiser furnish good title within a reasonable time. This she did not do, but instead advised Heiser's attorney, as she says, "in no uncertain terms," that she "was through, definitely through, and was not going to take the property." Heiser never acquiesced in her attempted rescission, and proceeded as rapidly as possible under the circumstances to get the lien off his property and tender good title to her.

Even if Mrs. Mathews' declaration that she "was through" could be construed as a demand that Heiser furnish good title within a reasonable time, it is our feeling that his tender of good title on February 21st was, under all the circumstances, within a reasonable time.

The exchange agreement never having been rescinded and Heiser having tendered good title, it became Mrs. Mathews' obligation to tender good title to her lots. (We accept her contention and the trial court's finding that Heiser had waived her obligation to furnish title insurance on her lots until such time as he had obtained clear title to the resort property.) She ignored the request which accompanied Heiser's tender of title that she secure title insurance on her lots by March 1, 1951 (or such later date as

might be agreed upon), and by so doing breached the exchange agreement.

■ The next problem for consideration is the effect, if any, of Heiser's request that Mrs. Mathews execute the contract he tendered at the time he tendered evidence of good title.

The exchange agreement says nothing about the execution of another contract. We direct attention to paragraphs 8 and 9 of that agreement:

"8. Each conveyance shall be a warranty deed conveying the respective properties free of incumbrances except as herein stated, and those created or suffered by the act or default of the other party.

"9. This contract shall be closed and deeds delivered at the office of Henry Elliott, Dexter-Horton Bldg., Seattle, Wash. within five days after the titles have been insured or accepted."

Paragraph 9 is open to the construction that the deeds were to be delivered to the grantees named therein within five days after the titles had been insured. In view of the fact that Mrs. Mathews would still owe almost fifty thousand dollars on the resort property, it would not be unreasonable to believe that the parties anticipated that, while Heiser was to deliver the deed to the resort property to Henry Elliott's office, it was to be held there or elsewhere, to be delivered to Mrs. Mathews when the balance due had been paid. It is not argued nor is it necessary to decide whether Heiser had, by the exchange agreement, committed himself to exchange deeds with Mrs. Mathews when she furnished evidence of good title to her lots, without any security for the very substantial amount which would still be due him. It will be agreed that he was not entitled to dictate the terms of a contract or other security device; but the letter which accompanied the contract and the title report showing his title to be clear was in no sense an ultimatum. Heiser was entitled to raise a question as to what protection he was to have in event the amount due him was not paid; and the proposed contract was a reasonable, but not the only possible, solution of a problem that was not specifically covered

by the exchange agreement. It was no more than a proposed contract, duplicate originals of which were stated to be at Henry Elliott's office "awaiting your examination and execution." Mrs. Mathews was not foreclosed from raising any question she might have as to the terms of the contract, nor from insisting that she was not obligated to execute any contract whatsoever. She raised no question, but took the untenable position that either the exchange agreement was void because of Heiser's inability to furnish good title within the ninety-day limitation of the contract or she had rescinded the contract on January 10, 1951.

Were we to follow our sympathies, we could wish that there was some way to permit Mrs. Mathews to recover her down payment of five thousand dollars; but we cannot escape the conclusion that she, not Heiser, refused to perform and breached the exchange agreement, and that Heiser did not by his request for a contract terminate the exchange agreement or excuse her performance thereof; hence, she cannot rescind and recover the payments thereunder. *Ready v. Sound Inv. Co.*, 64 Wash. 422, 116 Pac. 1093 (1911); *Garrison v. Newton*, 96 Wash. 284, 165 Pac. 90 (1917); *Litel v. Marsh*, 33 Wn. (2d) 441, 206 P. (2d) 300 (1949). And since there was no rescission, she was in possession of the resort property under her agreement with Heiser until she abandoned it February 21, 1951, and cannot recover for her losses in the operation of the property from January 1st to February 21st. As she established no basis for recovery on any phase of her case, her complaint should have been dismissed.

As to the cross-complaint, Heiser failed to establish that he sustained any damage as a result of Mrs. Mathews' breach of the exchange agreement. He relies upon his sale to Grant for fifty-six thousand dollars as the basis for establishing his damage. No citation of authority is needed to support the proposition that his sale to Grant does not establish the market value of the property. The damage in such a case is the difference between the unpaid balance of the principal under the contract which was breached and

abandoned and the market value of the property at the time of the breach. *Reiter v. Bailey,* 180 Wash. 230, 39 P. (2d) 370, 97 A. L. R. 1489 (1934). We are in full accord with the trial court's statement that there was no testimony upon which the reasonable market value of the property could be determined "at any time or at any stage." The appellant's cross-complaint was properly dismissed.

The judgment against the appellant is reversed and the cause remanded, with instructions to dismiss both the complaint and the cross-complaint, with a judgment for costs against the respondent, Mrs. Mathews.

SCHWELLENBACH, HAMLEY, FINLEY, and OLSON, JJ., concur.

May 11, 1953. Petition for rehearing denied.

[1]Reported in 255 P. (2d) 379.