[No. 31672. Department Two. August 30, 1951.]

P. E. JACKS *et al., Respondents,* v. A. B. BLAZER
*et al., Appellants.*[1]

*Jerome Williams,* for appellants.

*C. Orno Shoemaker, Davis, Trezona & Chastek,* and *Will Lorenz,* for respondents.

WEAVER, J.—This action was brought by the seller to recover the price of three carloads of lumber ordered by, and

[1]Reported in 235 P. (2d) 187.

delivered to, the buyer. The buyer admitted delivery and nonpayment, but cross-complained for substantial damages for alleged breach of contract.

In 1947, P. E. Jacks, one of the plaintiffs and respondents, was the sole owner and operator of J. B. Lumber Company at Clarkston, Washington. He manufactured and sold lumber. He was indebted to the Troy Lumber Company, of Lewiston, Idaho. That company, by its president, Axel R. Bohman, had financed Mr. Jacks' total mill operations. The indebtedness was secured by chattel mortgage on the entire property of the J. B. Lumber Company, including lumber piled on its premises.

It had been customary for the Troy Lumber Company to accept the entire output of the J. B. Lumber Company mill and thus reduce the indebtedness. In the fall of 1947, Mr. Jacks had some 1,400,000 board feet of lumber piled on his premises, all subject to the mortgage of the Troy Lumber Company. Mr. Bohman informed Mr. Jacks that the balance of the cut for 1947 could be sold by him, as the Troy Lumber Company could not handle it.

Mr. A. B. Blazer, one of the defendants, cross-complainants and appellants, was a dealer in automobile trailers. He bought lumber, especially the better grades, and resold to trailer and other manufacturers. His principal place of business was Spokane.

October 29, 1947, Mr. Jacks, by written contract, sold the balance of his 1947 cut to Mr. Blazer. The contract provided, among other things, that Mr. Blazer should keep ten thousand dollars on deposit in the State Bank of Clarkston, to be paid to Mr. Jacks as the lumber was shipped, according to Mr. Blazer's directions. Payment was to be made upon presentment of bills of lading to Mr. Blazer's Clarkston agent. Practically all of the proceeds of this sale were paid to the Troy Lumber Company upon its mortgage debt. Mr. Blazer knew of this. The 1947 contract was fully performed.

January 29, 1948, Mr. Jacks and Mr. Blazer entered into a new written contract. This contract was prepared by the then attorneys for Mr. Blazer. It dealt entirely with lumber

to be cut and milled during the 1948 season. Mr. Jacks agreed to produce, manufacture, sell, and deliver to Mr. Blazer, who agreed to buy, and pay for, the first two million feet of ponderosa pine lumber in all grades of select, shop, and common, except number 5 common. In addition, the contract gave Mr. Blazer an exclusive option to purchase the entire balance of the 1948 cut of ponderosa pine upon the same terms and conditions.

The contract was known in the trade as a "clean-up" contract. Its purpose was to insure to the manufacturer a ready market for his entire output, including the common grades which were more difficult to sell without including some of the better grade lumber.

The price schedule attached to the contract provided, in part:

"All prices are for *rough green* Ponderosa Pine lumber and [Blazer] reserves the right to dry said lumber on [Jacks'] premises, without cost to [Blazer]." (Italics ours.)

The contract further provided that Mr. Jacks should pile all lumber in neat and workmanlike piles, "but in any event [Jacks] shall pile said lumber according to [Blazer's], or his agent's, instructions"; that Mr. Jacks would, when requested by Mr. Blazer, load the lumber without charge and ship it to him or to whomever Mr. Blazer might designate; that Mr. Blazer should have the right to store and warehouse the lumber for "drying or any other purpose" upon Mr. Jacks' premises "until shipment and delivery orders are given [Jacks] by [Blazer] and the lumber is shipped in accordance therewith"; that Mr. Blazer had the right at all times to have an agent at the mill to give instructions regarding manufacturing specifications, piling, and shipping of the lumber.

Mr. Jacks had no operating capital. His mill was mortgaged. The daily overhead cost of its operation was approximately twelve hundred dollars. He had been financed in prior years by the Troy Lumber Company. It is at once apparent that, if Mr. Jacks was to be able to operate his mill and Mr. Blazer to get the lumber, some method of financing

the operation was required. The contract was explicit as to this:

"4. (a) $35.00 per thousand feet board measure shall be paid by [Blazer] to [Jacks] when the quantity of lumber in a pile, or piles, upon which no payment has been made, amounts to 100,000 feet, or more, and the same has been tallied by [Jacks], subject to [Blazer's] right to verify said tally.

(1) At the time [Blazer] pays the said $35.00 per thousand B. M. [Jacks] agrees to execute and deliver to [Blazer] a Bill of Sale to said lumber indicating its description, quantity and location. The ownership and title to said lumber shall thereupon pass to [Blazer], and [Jacks] shall immediately plainly mark said piles of lumber as the property of [Blazer], . . .

(b) $5.00 per thousand feet Board Measure shall be paid by [Blazer] to [Jacks], in addition to (a) above, at the time 100,000 feet, or more, of said lumber has been shipped, according to [Blazer's] instructions . . .

(c) The balance of the purchase price, that is the difference between the $40.00 paid, as in (a) and (b) above, and the prices schedules on Exhibit 'A' shall be paid by [Blazer] to [Jacks] at such time as 500,000 feet, or more, of said lumber has been shipped according to [Blazer's] instructions, . . ."

In order to implement the financing of the project, the 1948 contract provided:

"6. That [Blazer] agrees to keep on deposit with the State Bank of Clarkston, Clarkston, Washington, to the credit of [Blazer], the approximate sum of $10,000.00, to expedite and aid in the payments to be made, as set forth above; . . ."

May 28, 1948, Innis R. Johnson, one of the respondents, purchased a one-fourth interest in the J. B. Lumber company from Mr. Jacks. Thereafter, respondent R. E. Oglesby purchased a one-eighth interest. It was stipulated at the trial that the partners had assumed the liabilities under the contract of January 29, 1948.

June 8, 1948, before the J. B. Lumber Company had commenced cutting lumber and pursuant to Mr. Jacks' instructions, his attorney wrote Mr. Blazer that Mr. Jacks requested him to give notice that he (Mr. Jacks) insisted upon the strict

performance of paragraph 6 of the contract, and unless the ten thousand dollars was kept on deposit in the Clarkston bank, the contract would be canceled. Under these circumstances, there could be no misunderstanding of the meaning of paragraph 6 and of its importance to the success of the project.

The J. B. Lumber Company commenced cutting lumber about June 10th, and during the remainder of the season the cut averaged 20,000 board feet a day. Mr. Blazer knew of the operation and of the mill's daily capacity.

From this point on, the record is replete with conflicting testimony as to what happened; so much so in fact that the trial judge, in his oral opinion, given after eight days of trial, stated: "Somewhere in here someone just isn't telling the truth." The record, however, amply demonstrates that the following took place:

Prompted by the letter of June 8th, Mr. Blazer and his Spokane lawyer (not of counsel in this case) went to Clarkston about June 20th. They met with Mr. Blazer's Clarkston agent, also a lawyer, and with Mr. Jacks and his lawyer. The contract of January 29, 1948, was modified by agreement in the following respects: (a) the price of common grades of lumber was increased five dollars per thousand feet; (b) Mr. Jacks might, and would, endeavor to sell the common grades of lumber to third parties; (c) forty dollars (instead of thirty-five dollars) per thousand feet would be advanced as each 100,000 feet of lumber was cut and piled; and (d) the balance of the purchase price would be paid as the lumber was shipped.

Shortly thereafter, Mr. Blazer's lawyer and his resident agent in Clarkston met with Mr. Jacks, Mr. Johnson, and Mr. Bohman, president of the Troy Lumber Company. Mr. Blazer's lawyer testified: "I know that I really felt something had to be done about those three things, really." He was referring to the claim of the Troy Lumber Company, the ten thousand dollar deposit called for by paragraph 6 of the contract of January 29, 1948, and the chattel mortgage of the Troy Lumber Company. The Troy Lumber Company

thereupon released its chattel mortgage upon "all lumber now on or hereafter placed on the premises commonly known as 'J. B. Lumber Company' " and consented to a revocation of assignment of funds theretofore made by Mr. Jacks to it. These instruments, dated June 24, 1948, were furnished to Mr. Blazer's lawyer. It is apparent he accomplished two of his concerns; the third was not handled so meticulously.

On June 29, 1948, there was on deposit in the Clarkston bank to Mr. Blazer's credit, to be used under the direction of his Clarkston agent, the sum of $984.52, which was the balance remaining from the performance of the 1947 contract. On that date, at the request of Mr. Blazer's lawyer in Spokane, his agent in Clarkston deposited a $9,100 check to Mr. Blazer's account, bringing the deposit to over $10,000. This is the only time during the entire 1948 transaction that the account ever reached that amount.

On the same day, $4,200 was transferred from that account to the J. B. Lumber Company. Mr. Blazer testified that "he was told" that 100,000 feet of lumber was cut and piled in respondents' yard on June 29, 1948. Accordingly, by the same instruction which authorized his Clarkston agent to deposit the $9,100 check, Mr. Blazer's lawyer authorized the Clarkston agent to make a payment to Mr. Jacks. The $4,200 represented an advance or "draw" under the terms of the contract for lumber then piled in the yard of the J. B. Lumber Company, at $40 per thousand feet.

By July 16, 1948, over 100,000 feet of lumber had been shipped to Mr. Blazer. This exhausted the advance of $4,200. On that day there was less than $4,000 on deposit in the Clarkston account. Nearly half of this amount was later used in payment for lumber shipped. Mr. Blazer made nine further deposits to his Clarkston account, but an examination of respondents' invoice book shows that they were made in order to pay for lumber about to be, or already, shipped to him. No advance payment, other than the original one of $4,200, was ever made or tendered under the terms of the contract. Lumber was shipped only upon order of either Mr. Blazer or his Clarkston agent.

Bearing in mind that Mr. Blazer had purchased *the entire* output, up to two million feet, of the J. B. Lumber Company (except No. 5 common), that "all prices are for rough green lumber," that he had the right to store the lumber "for drying or any other purpose," that he knew of the financial condition of the J. B. Lumber Company and had received the letter of June 8, 1948, the testimony of Mr. Blazer concerning the Clarkston bank account, upon which his Clarkston agent had authority to draw, is illuminating. He testified:

"Q. You knew, though, as a matter of fact, that the bank statement of the bank account at the State Bank of Clarkston wasn't maintained at the $10,000.00 you agreed upon? A. Oh yes, I knew it wasn't maintained to the extent of the $10,000.00. Q. And you knew also that the contract called for it, didn't you? A. I wasn't going to give them no fifty thousand blanket draw with rough green lumber coming in the way it was. Q. In other words, is that the reason you didn't keep it up? A. Oh, it most certainly was the reason there wasn't more money."

Mr. Johnson testified that, on July 29, 1948, he went to the office of Mr. Blazer's Clarkston agent, told him that he had 300,000 feet of lumber piled in the yard of the J. B. Lumber Company, and "would like to get money on it." Mr. Johnson stated that the agent showed him the bank statement and advised him that there was not sufficient money, and consequently no advance would be made. On that day, the bank statement showed a balance of $2,413.54. Mr. Johnson said: "I told him if that account wasn't kept up and straightened up that Mr. Blazer and us was going to do a different kind of business." The agent knew lumber was piled in the yard of the lumber company at the time of Mr. Johnson's visit, remembered him being irate because "the account was low," but had no recollection of any demand for an advance. The trial court found that the demand had been made.

Thereafter, a "different kind of business" was done. In order to meet the month-end payroll and other expenses, Mr. Johnson borrowed money from a friend and later paid

him in lumber. The partners loaned personal funds to the partnership. Commencing August 19, 1948, lumber (other than common) was sold and shipped to third parties. Upon order, further shipments were made to Mr. Blazer. October 15th of that year, Mr. Blazer appeared at the office of the J. B. Lumber Company and presented his business card, on the back of which was typed a price list headed: "Buying Prices 10/15/48 . . . Ponderosa Pine F. O. B. Cars." At the bottom of the list was the statement: "Prices subject to change without notice." When presented, Mr. Blazer said: "Hereafter you can invoice your lumber at these prices."

Mr. Blazer has not paid for three of the last four cars of lumber ordered by him; hence, this action. He has cross-complained for damages for nondelivery to him of the lumber sold to third parties by the J. B. Lumber Company, commencing August 19, 1948.

The trial court found the contract was breached immediately upon appellants' failure to maintain the Clarkston bank balance; and that the contract was breached by appellant Blazer when, on July 29, 1948, respondent Johnson made an *actual demand* upon Mr. Blazer's agent for a cash advance in accordance with the terms of the contract, for lumber then piled in the yard of the J. B. Lumber Company; that thereafter, the parties did business on an individual order basis. Judgment was entered for the plaintiffs. Defendants' cross-complaint was dismissed.

Insofar as our findings exceed those of the trial court, they are supported by the record.

Appellants' first six assignments of error are directed to the findings of fact. Assignments of error 7, 8, and 9 are based upon the trial court's refusal to make certain findings proposed by appellants.

We have examined the entire record. The evidence, considered in its entirety, does not preponderate against the findings of the trial court. *Shultes v. Halpin*, 33 Wn. (2d) 294, 205 P. (2d) 1201; *Barrington v. Murry*, 35 Wn. (2d) 744, 215 P. (2d) 433. The assignments of error directed to the findings of fact are without merit.

■ "A breach or non-performance of a promise by one party to a bilateral contract, so material as to justify a refusal of the other party to perform a contractual duty, discharges that duty." 2 Restatement, Contracts, 750, § 397.

The J. B. Lumber Company's duty, prior to the breach of the contract by Mr. Blazer, was not to sell lumber (except common grades) to others. If either the failure to maintain the bank account, or the failure to make a cash advance when it was demanded, was "material," within this rule, it is evident that respondent's duty not to sell to others was discharged and that they might do so thereafter. In view of our holding, it is not necessary that we express our view as to the materiality of the first breach found by the trial court.

One writer has commented upon § 397, *supra*, as follows:

"At first sight, this appears to be a mere truism, merely saying that a promisor's duty is discharged if he doesn't have to perform. But reference back to §§ 274-279 is made for the tests as to when a non-performance by one party is 'so material' as to operate as a discharge. In particular, § 276 gives rules for determining whether a breach by delay in performance is so material as to discharge the other party." 6 Corbin, Contracts, 7, § 1253, note 8.

Section 276 of the Restatement of Contracts, insofar as it is here material, provides:

"In determining the materiality of delay in performance, the following rules are applicable: . . . .
"(b) In mercantile contracts performance at the time agreed upon is important, and if the delay of one party is considerable having reference to the nature of the transaction and the seriousness of the consequences, and is not justified by the conduct of the other party, the duty of the latter is discharged."

No effort was ever made thereafter to maintain the Clarkston bank account in the agreed amount, or to make advances as lumber was cut and piled.

■ When a contract is severable, failure to pay promptly may or may not excuse performance and warrant cancellation of a contract. *Nott-Atwater Co. v. Berry*, 145 Wash. 640, 261 Pac. 390. The materiality of the breach is

the important question. 2 Williston, Sales (Rev. ed.) 770, § 467b. This is dependent upon the circumstances of each particular case.

 In the instant case, the contract was executory and continuing in nature. The rights of the parties were mutual and dependent. The mill was mortgaged. The daily cost of its operation was about twelve hundred dollars. Respondents had no operating capital. The cash advance upon accumulated lumber was necessary to keep the mill in operation. When the cash advance was not available, respondents had the choice of closing their mill or of selling lumber to others in order to get funds. Of these facts, appellant Blazer and his agent had knowledge.

It is clear, regardless of whether the bank balance was maintained at the agreed amount, that the failure to make an advance payment upon demand on lumber piled on July 29, 1948, was a breach of the contract, so material in nature that it operated as a discharge of it. The case of *Balcom v. Kohno*, 124 Wash. 628, 215 Pac. 17, cited by appellants, is not controlling because, in that case, the record did not indicate that withholding of payment was considered by either party as a breach of the contract.

In a similar factual situation, a like breach has been held to be material. In *Robson v. Bohn*, 27 Minn. 333, 7 N. W. 357, the plaintiff contracted to sell 425,000 feet of lumber to defendant, delivery to start at once and continued at not less than 20,000 feet per week, delivery to be completed by September 1st. Defendant was to execute and deliver his promissory note for $3,000 at once, pay $2,000 cash on August 1st, and, on complete delivery of the lumber, pay therefor at the rate of $15.50 per thousand feet, less the $5,000. Defendant did not pay the $2,000 deposit on August 1st, and plaintiff stopped delivering lumber. In entering judgment for plaintiff, the court said:

"It cannot reasonably be supposed that the parties intended that either party should be bound to perform on his part, though the other should refuse to do what he was required to do. No one could doubt that, in a contract for the sale of property, in which the time for paying the con-

sideration is a date prior to that for the transfer of the property, the payment of the consideration is intended to be a condition precedent to the obligation to transfer. . . . The defendant, therefore, having without excuse refused to perform a contract on his part, the plaintiff had a right to treat it as at an end, as he has done, and to recover upon defendant's implied contract to pay the value of the lumber delivered to and accepted by him."

That the parties, in the instant case, thereafter abandoned the contract and dealt upon an order basis, is amply supported by the evidence. No theory consistent with the continuation of the contract of January 29th can explain Mr. Blazer's action in presenting a new price schedule (on the back of his business card) stating "Prices subject to change without notice" and in telling Mr. Jacks, "Hereafter you can invoice your lumber at these prices."

In view of our conclusion, it is unnecessary to discuss the assignments of error relating to the exclusion of evidence probative of damages to appellants.

The judgment is affirmed.

SCHWELLENBACH, C. J., MALLERY, GRADY, and HAMLEY, JJ., concur.