[No. 52577-3. En Banc. December 11, 1986.]

GREGORY B. WILLENER, ET AL, *Appellants,* v.
STANLEY J. SWEETING, ET AL,
*Respondents.*

*Barney & Weiner* and *Richard M. Barney, Jr.,* for appellants.

*McGavick, Graves, Beale & McNerthney* and *Robert L. Beale,* for respondent Arden Sweeting.

*Kane, Vandeberg, Hartinger & Walker,* by *Harold T. Hartinger* and *James A. Krueger,* for respondents Stanley Sweeting, et al.

DOLLIVER, C.J.—Plaintiffs commenced an action to recover lost profits and earnest money deposits paid pursuant to an agreement to purchase real property. Plaintiffs claim defendants breached the agreement by failing to deliver marketable title at closing. Plaintiffs appeal the denial by the trial court of their claim for lost profits, attorney fees, and start–up costs. As cross appellants, the defendants seek a reversal of the trial court's refund of

plaintiffs' earnest money plus interest.

Defendants purchased 20 acres of undeveloped land in Pierce County at the intersection of Phillips Road and Steilacoom Boulevard. They sold the northerly 13 acres and paid off their contract of purchase. In August 1966, defendants leased the southeast corner of the property to Standard Oil Company of California. Standard Oil built a service station on the property and was in possession of the leased property during 1979 and 1980.

In 1978 defendants listed the remaining 7 acres for sale with Lundstrom, Inc., a real estate office. Douglas B. Mykol, one of the plaintiffs, was a real estate agent who worked for Lundstrom. A prospective buyer made an offer for the property in 1978, but forfeited the deposit in 1979 when the earnest money agreement expired. At that point, on July 26, 1979, plaintiffs Douglas Mykol and Gregory B. Willener, calling themselves the Colorado Land and Holding Company, submitted the earnest money agreement at issue in this case. They paid $10,000 as provided in this agreement and proposed to pay $215,000 at closing no later than December 15, 1979, with the balance of $535,000 to be paid in full within 3 years. The sale excluded the land leased to Standard Oil. Soon thereafter, plaintiffs accepted earnest money from another party for the resale of a part of the property lying adjacent to the Standard Oil parcel. The price was $90,000 and that transaction was also to close on December 15, 1979.

Defendants agreed in the earnest money agreement to cooperate with plaintiffs in obtaining a short plat of the property and to grant an easement for ingress, egress, and utilities over the private roads of the short plat. Plaintiffs were to pay for all improvements to the plat. This short plat was not a condition precedent to the closing of the sale. Plaintiffs had until September 15, 1979, to conduct surveys and soil tests and make other studies as they deemed necessary, at their expense. They also had until September 15 to elect not to proceed and recover $5,000 of their deposit, or if they proceeded, the full $10,000 would

be nonrefundable and they would deposit an additional $5,000 and extend the agreement to October 15. By October 15, plaintiffs had to elect finally whether to close by December 15; if they decided not, the full $15,000 would be forfeited.

Plaintiffs employed an engineering, planning, and survey firm to assist them in obtaining the short plat. On August 29, plaintiffs accepted the preliminary title report and defendants signed a short plat of the property. Defendants' principal spokesman, Stanley J. Sweeting, at that point suspected Standard Oil had made improvements which encroached both on the county right of way and on the property being sold to plaintiffs. He notified the Lundstrom agency of this boundary problem and Lundstrom suggested that the surveyors should resolve it.

On August 30, plaintiffs agreed to sell another part of the land they were buying to Kentucky Fried Chicken of Tacoma, Inc., with a closing date of December 15.

On September 5 and again on September 17, plaintiffs informed defendants that the land occupied by Standard Oil varied somewhat from the property described in the lease and suggested a change in the legal description in the lease. Plaintiffs also exercised their option to continue the transaction and paid an additional $5,000 deposit.

On September 19, Lundstrom, ostensibly the sellers' agent, suggested to the sellers/defendants by letter that they had the responsibility of correcting the legal description problem and should retain an engineering firm to do so. Defendants responded by directing Lundstrom to disburse the deposited funds to them and indicating they would proceed according to the written agreement. On October 2, all parties signed an agreement stating that the short plat was satisfactory to the buyers; the sellers did not guarantee the accuracy of the short plat; the buyers had completed all surveys, soil tests, and studies satisfactorily; all funds paid to date could be disbursed to sellers and were not refundable; and buyers would inform sellers by October 15, 1979 whether they would proceed to closing. The

deposits were disbursed to sellers immediately. On October 15, buyers stated that all contingencies had been met and they would close.

Defendant Sweeting then obtained Standard Oil's consent to an amendment of the lease to reflect the legal description including the land actually occupied by Standard Oil, including the encroachment of some 10 feet upon the land being sold. Defendants informed plaintiffs that a disparity between the leasehold description and the short plat would not negate the closing requirement or change the property described in the earnest money agreement. Mykol agreed to have his engineer draft an amendment to the lease, which would reduce slightly the size of the property being sold and increase commensurately the property being leased. He sent an amendment of the lease to sellers for their signatures. At closing, the amendment was not signed by defendant Pacific National Bank of Washington, as trustee for John L. Crawford nor by Standard Oil Company. The amendment was never delivered into escrow, but the escrow company was otherwise prepared to close the transaction. Also, at closing, the escrow company had received only $1 from plaintiffs as funds to close the sale.

On December 19, 1979, past the closing date, plaintiffs notified defendants the sale could not be closed because defendants were unable to convey the exact property described in the earnest money agreement. They blamed defendants for forcing a closing that might expose the plaintiffs to lawsuits and claims against the property, and requested an extension of the closing dated to December 28 so that defendants could correct the leasehold legal description.

Defendants requested an additional $10,000 as consideration for an extension to December 28, which plaintiffs "paid" in the form of $1 in cash and a note for $9,999 due December 28, 1979. On December 21 defendants, except the John L. Crawford Trustee, signed a real estate contract to sell the property. On December 28, plaintiffs repeated their position that the deal could not close because defend-

ants would not deliver title free and clear, but offered to negotiate and extend the time for solving the problem. Defendants demanded payment of the note representing additional earnest money, and later notified buyers that the earnest money agreement was null and void. Approximately 5 months later, plaintiffs instigated this action.

The trial court denied plaintiffs' claim for damages, lost profits, and recovery of start–up expenses, but ordered a full refund of their earnest money and cancellation of the note representing the earnest money of December 28. The court also awarded plaintiffs interest and costs. Plaintiffs appealed from the court's denial of their claim for lost profits and expenses. Defendants cross–appealed from the court's refunding of the earnest money deposits and denial of attorney fees. The case was transferred to this court pursuant to RAP 4.3 on March 19, 1986.

█ Plaintiffs are challenging the trial court's conclusions of law claiming they are not supported by the findings of fact. Appellate review is limited to determining whether the trial court's findings are supported by substantial evidence and, if so, whether the findings in turn support the conclusions of law. *Goodman v. Darden, Doman & Stafford Assocs.*, 100 Wn.2d 476, 670 P.2d 648 (1983).

Plaintiffs claim there is no evidence to support many of the trial court's conclusions of law. Upon review of the record, this contention is unfounded. The record supports the trial court's judgment. We affirm the trial court's decision awarding plaintiffs a refund of their earnest money plus interest and denying plaintiffs' claim for lost profits, attorney fees, and start–up costs. We deny defendants' cross appeal.

I

Plaintiffs claim they are entitled to judgment for loss of profit and recovery of their start–up costs because defendants breached the earnest money agreement. Defendants claim plaintiffs' failure to tender the down payment at closing precludes a breach of contract suit.

■■ If a contract requires performance by both parties, the party claiming nonperformance of the other must establish as a matter of fact the party's own performance. *Reynolds Metals Co. v. Electric Smith Constr. & Equip. Co.*, 4 Wn. App. 695, 483 P.2d 880 (1971). Thus, the first issue to resolve is whether plaintiffs sufficiently performed under the agreement to claim nonperformance of defendants.

The trial court stated in conclusion of law 8:

Neither plaintiffs nor defendants performed under the July 30, 1979, Earnest Money Agreement. The defendants did not deposit in escrow the documents required to convey marketable title to the real property to the plaintiffs. The plaintiffs did not deposit the $200,000 in escrow.

The question of performance is a question of fact and the court's conclusion does appear to be more like a finding of fact than a conclusion of law. A conclusion of law erroneously described as a finding of fact is reviewed as a conclusion of law. *Woodruff v. McClellan,* 95 Wn.2d 394, 622 P.2d 1268 (1980). The corollary must also follow; a finding of fact erroneously described as a conclusion of law is reviewed as a finding of fact. Under these circumstances, we will review the conclusion of law as a finding of fact and look for evidence in the record to support the finding. *Golberg v. Sanglier,* 96 Wn.2d 874, 639 P.2d 1347, 647 P.2d 489 (1982).

The record supports this finding. Patricia Johanson, handling escrow for this ill–fated venture, testified her escrow company had received only $1 from plaintiffs as funds to close the sale on the date of closing. The escrow company appeared to be ready to close the sale had plaintiffs brought in money and had defendants signed the contract and escrow. There is substantial evidence plaintiffs did not perform.

The next issue is whether the parties' duties were concurrent conditions or whether plaintiffs were waiting on a condition precedent. We have held a purchaser may not

rescind a contract without a tender of the purchase price if the duties are concurrent. *Gillmore v. Green,* 39 Wn.2d 431, 437, 235 P.2d 998 (1951). A vendor selling land may not put the buyer in default until the vendor has offered to perform; the payment of the purchase price and the delivering of the deed are concurrent acts. *Bendon v. Parfit,* 74 Wash. 645, 134 P. 185 (1913). However, where performance of one party is a condition precedent to a right of action on performance of another, a party is not required by law to do a useless act and tender performance where the other party cannot or will not perform that party's part of the agreement. *Jenson v. Richens,* 74 Wn.2d 41, 46, 442 P.2d 636 (1968).

Plaintiffs argue defendants were required to tender a marketable title before they were required to deposit their down payment into escrow. Review of the agreement, however, yields a different conclusion. Paragraph 11 of the agreement states that "purchaser and seller shall deposit with closing agent all instruments, documents and monies necessary to complete the sale in accordance with this agreement." Nowhere in the agreement is an order placed on who must perform first. Instead, the language in the agreement establishes the closing agent as the depository for *both* parties to tender their part of the contract performance.

The plaintiffs next claim that even if the parties had concurrent conditions they did not have to tender performance because defendants' inability to provide a marketable title rendered plaintiffs' performance useless. As the trial court concluded in conclusion of law 9, however, neither plaintiffs nor defendants could have known on the closing dates the other party "could not, would not and was not going to perform" as required by the agreement.

A marketable title is one free of reasonable doubt and is a title a reasonably informed and intelligent purchaser would be willing to accept. *Brown v. Herman,* 75 Wn.2d 816, 454 P.2d 212 (1969). While the title need not be perfect in every sense, any defects should not cause one to

question its validity. *Brown,* at 823. The key to the marketability of defendants' title centers around the encroachment and the subsequent lease agreement. The court concluded the lease amendment resolving the encroachment problem would have corrected the title problem.

The trial court found, and it is supported by substantial evidence, that plaintiffs could not have known defendants were not ready to submit a marketable title for final closing. All parties to the lease agreement testified they were ready and willing to sign. Plaintiffs were not excused from performing their concurrent act of tendering their down payment at closing. Because of our determination of this issue, we need not address the question of whether there was waiver and estoppel by plaintiffs.

Substantial evidence in the record supports the trial court's conclusion plaintiffs did not perform their part of the contract. There is testimony throughout the record questioning plaintiffs' ability to provide the necessary funds to close the deal with defendants. Plaintiffs had a concurrent duty to perform; they did not perform. Their failure to perform was not excused. They have no right to bring an action for contract damages.

The same law that applies to plaintiffs applies to defendants. If defendants have not performed, they cannot bring an action for the liquidated damages available from breach of the agreement. The trial court found defendants did not satisfy the performance required by the agreement. Defendants did not deposit in escrow the documents required to convey marketable title to plaintiffs. This fact is undisputed. For the same reasons plaintiffs were denied contract damages, defendants should not receive contract damages of plaintiffs' earnest money in forfeiture pursuant to paragraph 3 of the agreement. *Reynolds Metals Co. v. Electric Smith Constr. & Equip. Co.,* 4 Wn. App. 695, 483 P.2d 880 (1971).

## II

In plaintiffs' complaint, they ask for "such other and

further relief as the court deems just and equitable in the premises." Equitable relief is appropriate where there are two private parties in dispute within a contractual or property relationship. *Eastlake Comm'ty Coun. v. Roanoke Assocs.*, 82 Wn.2d 475, 513 P.2d 36, 76 A.L.R.3d 360 (1973). Although both parties withdrew from their agreement declaring the contracting documents to be null and void, the court in essence appeared to rescind the contract. "Rescission" is an equitable remedy and requires the court to fashion an equitable solution. *Busch v. Nervik,* 38 Wn. App. 541, 687 P.2d 872 (1984). The solution should attempt to restore parties to the relative positions they would have occupied if no contract had ever been made. The circumstances of each case largely determine what is necessary for one party to do to put the other in status quo. *Busch v. Nervick, supra.*

This is exactly what the trial court did in this case. Plaintiffs' contract damages were denied, but, because neither side performed, the trial court concluded plaintiffs should receive their earnest money deposits of $15,001 back plus interest of $6,076.02 (plus cancellation of the $9,999 promissory note). This judgment is consistent with *Hebb v. Severson,* 32 Wn.2d 159, 201 P.2d 156 (1948), where a buyer of land under a real estate contract providing for conveyance of deed free of encumbrances was entitled to rescission and return of all money paid if the title is encumbered. The trial court's judgments did not abuse its discretion and therefore should be upheld by this court. *Lorang v. Lorang,* 42 Wn.2d 539, 541, 256 P.2d 481 (1953).

### III

█ Finally, plaintiffs argue the trial court abused its discretion by denying their costs of discovery claimed necessary by defendants' failure to admit the truth of a matter. CR 37(c) provides reasonable expenses incurred in making proof of the offending party's failure to admit (including reasonable attorney fees). However, as plaintiffs note in their own brief, this procedure is to obtain "admission of

facts as to which there is no real dispute and which the adverse party can admit cleanly, without qualifications." *Reid Sand & Gravel v. Bellevue Properties,* 7 Wn. App. 701, 502 P.2d 480 (1972).

The determination of costs associated with CR 37(c) is within the bounds of the trial court's discretion. *Reid,* at 705. Unless the discretion is exercised on untenable grounds or for untenable reasons it will not be disturbed. *Reid Sand & Gravel v. Bellevue Properties, supra.* The question of when defendants actually knew about the encroachment does not appear to be the type of clean, clear issue anticipated in *Reid Sand & Gravel.* The conflicting survey reports regarding the encroachments on defendants' property would support a finding that the facts were somewhat in dispute. The trial court's denial of plaintiffs' costs does not appear to abuse its discretion.

Plaintiffs also claim there was no specific evidence presented to support the trial court's conclusion of law 10.

> The Court declines to find that the testimony and documented communications of either the plaintiffs or the defendants were totally accurate.

Although this conclusion may appear more properly as a finding of fact, it is well within the trial court's function to determine the credibility and veracity of testimony and communications. *In re Kuvara,* 97 Wn.2d 743, 649 P.2d 834 (1982). No further discussion is needed. Plaintiffs' claim here is without merit as well as harmless.

For reasons which do not appear on the face of the record, the parties here were unable to consummate their agreement. The trial court, after hearing lengthy testimony and reviewing the documents submitted, crafted an opinion consistent with law and equity and returned the parties to their original position.

Affirmed.

UTTER, PEARSON, ANDERSEN, CALLOW, and DURHAM, JJ., concur.

DORE, J. (dissenting)—I would hold that buyers, Willener and Mykol, breached the subject contract by failing to tender their cash down payment and that sellers, Sweeting et al, should be granted judgment in the amount of $15,001 plus interest on their cross complaint.

## FACTS

The buyers argue for a refund of their earnest money plus interest because the sellers allegedly were unable to deliver marketable title. However, the facts do not coincide with this assertion. Paragraph 3 of the earnest money agreement provided for the nondefaulting seller to retain all earnest money. Paragraph 4 required the sellers to furnish a standard form title insurance policy and a preliminary commitment issued by the title company. Earnest money was to be refunded only if title was uninsurable as of December 15, 1979, although the buyers could "waive defects and elect to purchase."

The earnest money agreement provided that half of the prepaid $10,000 was nonrefundable. However, the buyers could elect to proceed or not to proceed to closing, with an option deadline of September 15, 1979. If by that date the buyers elected to proceed, they knew that the entire $10,000 was nonrefundable. They further agreed to pay an additional $5,000 to again extend their option to proceed or not proceed. This second option deadline was October 15, 1979. Whether they elected to close or not, the buyers knew they would forfeit the full $15,000.

Title was insurable and escrow was ready to close on the appointed date. Previous to the date set for closing, on August 29, 1979, the buyers had accepted the preliminary title report. Although they knew that there existed certain landscaping and pavement encroachments by the sellers' lessee, Standard Oil, the buyers elected to advance their additional $5,000 earnest money. By so acting, the buyers acknowledged that any existing defects were curable, and thereby lost their right to later assert such defects to repudiate the contract. *See Kessinger v. Anderson*, 31 Wn.2d

157, 170–72, 196 P.2d 289 (1948); *Haire v. Patterson*, 63 Wn.2d 282, 288, 386 P.2d 953 (1963).

Further, the marketable title requirement of a seller is not title so perfect that it must be free from every conceivable technical criticism; title need only be free from those possibilities of defect which post a threat to its validity. *Liberty Lk. Sewer Dist. 1 v. Liberty Lk. Utils. Co.*, 37 Wn. App. 809, 817, 683 P.2d 1117, *review denied*, 102 Wn.2d 1009 (1984); *Brown v. Herman*, 75 Wn.2d 816, 823, 454 P.2d 212 (1969). Where, as here, an alleged defect involves only a small portion of the land being sold, where there is no danger that hostile claims will be entered against the title and a title insurance company is willing to insure it, a purchaser may not allege unmarketable title to escape his contract. *Central Life Assur. Soc'y v. Impelmans*, 13 Wn.2d 632, 644–45, 126 P.2d 757 (1942). The buyers lost their right to argue an alleged title defect when, knowing of the defect, they made voluntary payments on the contract and tried to sell part of the property. *Central*, at 647.

In their letter to Lundstrom, dated October 14, 1979, the buyers reiterated their satisfaction with the purchase. The buyers chose to consult their own engineering firm, which recommended that any defects be cured by slightly increasing the boundaries of the Standard Oil lease, thereby commensurately reducing the size of the property being sold. The buyers accepted this recommendation. By such acceptance, they agreed to surrender the encroaching land. By October 18, 1979, the buyers were preparing an amendment to the lease description. On numerous occasions thereafter they continued to assure the sellers that they were proceeding with the lease amendment and that all was well.

In the meantime the buyers had entered into two additional earnest money agreements with an auto parts business (Hollyoak–Boerner) and a fast food business (Kentucky Fried Chicken). In these earnest money agreements the buyers sought to convey part of the land at issue in this case. The closing date in both of these transactions was set for December 15, 1979, the same date set for closing

on the master property. However, in order to close these two transactions, the buyers had to file a short plat with the County, and in order to file the short plat, closing on the master property was needed. During the buyers' negotiations with Standard Oil, the sellers remained firm in their assertion that the short plat would neither negate the closing requirement nor change the property described in the earnest money agreement, and that the measurements of the short plat must coincide exactly with their land as described in the Standard Oil lease.

When on November 29, 1979, Lundstrom opened escrow on the master property he forwarded the earnest money agreement and an unsigned copy of the lease amendment. On December 3, he also sent the earnest money agreements for the two other transactions, although Willener and Mykol had not yet gotten the short plat from the County. Subsequently the lease amendment was never signed by Pacific National Bank for the John L. Crawford Trust (one of the sellers). It was also never signed by Standard Oil. The bank had agreed to sign after all other parties signed, and the buyers assured the sellers that Standard Oil would soon sign. However, on December 12, 1979 the buyers were told by their engineering firm that Standard Oil was hesitating due to its concern that its encroachments existed within county road right of way; Standard Oil was therefore awaiting assurance from the County that it would not have to remove the improvements at its own expense.

### Analysis

The real problem in this case thus emerges as a dispute over *when* to convey title. The real estate contract and escrow instructions of December 21, 1979, were never signed by the bank for the John L. Crawford Trust. Exhibit A to this contract called for the buyers to provide the legal description, and the sellers to then execute and deliver deeds "in partial fulfillment" of the contract describing the two additional parcels, thereby releasing some 40,000 square feet; upon such release the buyers would then give

the sellers a copy of the short plat.

Obviously the sellers were unwilling to deed over part of their land before they had their money. Such a requirement was not a part of their original agreement. When the buyers then deposited only $1 into escrow and tendered a mere note for the $9,999 balance to extend closing, it became clear that if the sellers delivered such title, they might not be paid at all. In such event, the sellers would only have had a legal claim against the buyers instead of the agreed cash. Therefore the bank would not sign the lease amendment and escrow instructions before Standard Oil signed, and without those signatures there would be no short plat approval.

Without title to the property involved in the two other transactions, the buyers could not sell it; and without funds from those sales, the buyers could not close on the master property. The buyers then sought legal advice in order to escape their agreement. Thereafter they wrote to Lundstrom on December 28, 1979 stating that they would not close unless the Standard Oil improvements were removed before closing.

The buyers' actions were clearly contrary to their prior agreement and representations that they would cure any existing defect. Thus it was the buyers, not the sellers, who were in breach. The sellers had a marketable title. The sellers knew that the buyers were without enough funds; hence, the sellers were excused from tendering a deed at closing. *Artz v. O'Bannon,* 17 Wn. App. 421, 426, 562 P.2d 674 (1977). They were not required to perform a useless act and tender closing documents, as they knew that the buyers didn't have the cash to close. *Jenson v. Richens,* 74 Wn.2d 41, 46, 442 P.2d 636 (1968).

The provision calling for forfeiture of earnest money upon the buyers' election to continue toward closing was a valid provision for liquidated damages. *Mahoney v. Tingley,* 85 Wn.2d 95, 98, 529 P.2d 1068 (1975); *Artz v. O'Bannon, supra* at 427. The buyers never objected to the sellers' receipt of their nonrefundable earnest money and extension

fee. By their actions on numerous occasions the buyers led the sellers to believe that any defects were curable and that the deal would close. Those actions preclude them from now asserting an unmarketable title. *See* Annot., *Marketable Title,* 57 A.L.R. 1253, 1550–54 (1928).

CONCLUSION

Because the buyers repudiated their contract, they were in default. Therefore the sellers were entitled to forfeit the $15,001 earnest money plus interest as liquidated damages.

I would have dismissed the buyers' lawsuit and granted the sellers judgment on their cross complaint, against the buyers, in the amount of $15,001 plus interest.

BRACHTENBACH and GOODLOE, JJ., concur with DORE, J.