# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

ZENITH GLOBAL SOLUTIONS, INC.,
dba ZENITH CAPITAL, a Washington
corporation,

          Respondent,

          v.

LINDEN VILLAGE ASSISTED LIVING
COMMUNITY, LLC, a Washington
limited liability company,

          Appellant.

DIVISION ONE

No. 81490-7-I

UNPUBLISHED OPINION

DWYER, J. — Linden Village Assisted Living Community, LLC appeals from a judgment entered against it following a bench trial. The judgment resulted from a finding that Linden had breached its contract with Zenith Global Solutions, Inc. Linden contends that the trial court erred in awarding damages to Zenith because Zenith also breached the contract at issue. Further, Linden avers that the trial court erred by not awarding damages to Linden. Because Linden failed to prove that (1) its nonperformance was excused, and (2) it suffered damages as a result of Zenith's breaches, we affirm the trial court.

I

In May 2013, Tribach Partners, LLC acquired a piece of real property at 13524 Linden Ave N., in Seattle, Washington. Christopher Chen, a governor of Tribach, intended for the development of the property to be used to create an

opportunity for Chinese nationals to obtain legal permanent residency in the

United States through the EB-5 program, which allows foreign nationals to obtain

legal permanent residency by investing in American companies. See EB-5

Immigrant Investor Program, U.S. CITIZENSHIP & IMMIGR. SERVS.,

https://www.uscis.gov/working-in-the-united-states/permanent-workers/eb-5-

immigrant-investor-program [https://perma.cc/EEH6-VBNF].

In October 2014, Chen, David Bovée of Zenith, and Stuart Brown of

Village Concepts, LLC signed a letter expressing their intent to put together a

team to construct an assisted living facility on the property utilizing EB-5 funding.

In 2015, Qiang "John" Tu, Bovée, and Chen formed Linden. Linden then

acquired the property.

Zenith began providing Linden with project development reports (PDRs) in

November 2015. Linden and Zenith entered into a Development Services

Agreement (DSA), effective August 1, 2016, which detailed the relationship

between Linden and Zenith for developing the project. Bovée played a major

role in both organizations—he both served as general manager of Linden and

was the sole owner and president of Zenith. This dispute arises from the DSA.

The DSA describes the services Zenith would provide as follows:

> 2. Scope of Services. During the term of this Agreement, Developer shall provide its respective expertise, and undertake the performance of the development services reasonably requested by Owner from time to time with respect to the Property and Project, including the following:
>
> (a) Oversight of the development of the Project at the Property and oversight and preparation of feasibility and market studies to determine the overall best use and senior housing mix for the Project;

(b) Obtain all necessary entitlements for the Project and coordinate with all necessary governmental and similar officials and individuals;

(c) Obtain or cause to be obtained any and all required permits and licenses (to operate the Project as an assisted living or memory care facility or otherwise) from the City of Seattle and the State of Washington (or other governmental bodies or agencies), generally based on the plans (the *"Project Plans"*) for the Project which have been or will be submitted to the City of Seattle and, if required, to the State of Washington (and coordinate such submittal if not already accomplished);

(d) Provide Owner with bi-monthly reports as to the status of the development of the Project; and

(e) Such other developmental services (i) as are customarily provided by developers of projects similar to the Project and at locations similar to the Property or (ii) as Owner and Developer shall agree.

In exchange, the agreement provided that Zenith was entitled to the following compensation:

5. Compensation. For services rendered pursuant to this Agreement, Owner shall pay the Developer a total development fee of five hundred thousand dollars ($500,000.00) (the *"Development Fee"*). The Development Fee shall be paid in the following installments:

(a) Owner shall pay Developer the sum of fifteen-thousand dollars ($15,000.00) per month beginning the month in which the Effective Date occurs and ending the month in which the construction phase begins, subject to a maximum of twelve (12) such monthly payments.

(b) Owner shall pay Developer the sum of seven-thousand five-hundred dollars ($7,500.00) per month beginning the first month following the month in which the construction phase of the Project begins and ending the month in which a certificate of occupancy is issued for the Project by the applicable governmental entity, subject to a maximum of sixteen (16) such monthly payments.

(c) Upon the issuance of a master use permit, Owner shall pay Developer the sum of fifty-thousand dollars ($50,000.00).

(d) Upon the issuance of a HUD[1] commitment for a Section 232 loan, Owner shall pay Developer the sum of fifty-thousand dollars ($50,000.00).

(e) Upon the commencement of the construction phase of the Project, Owner shall pay Developer the sum of fifty-thousand dollars ($50,000.00).

(f) Upon the issuance of a certificate of occupancy, Owner shall pay Developer any then unpaid balance of the Development Fee.

The DSA provided that Linden could terminate the agreement under certain conditions:

8. Term; Termination.

(a) The initial term of this Agreement shall commence on the Effective Date and end upon the issuance of a Certificate of Occupancy for the Project and payment of the Development Fees, subject to earlier termination as provided in this Agreement.

(b) Notwithstanding the term of this Agreement, this Agreement may be terminated (without cost or penalty to Owner) at any time by Owner for "cause" (as defined below). This Agreement shall terminate automatically with no notice required, upon (i) the sale of the Property or Project, (ii) if required by any lender pursuant to loan documents entered into by Owner, or (iii) upon foreclosure or transfer by deed-in-lieu of foreclosure to the exiting lender or a successor lender. For purposes hereof, the phrase "cause" means the occurrence of any one or more of the following:

(i) the gross negligence or willful, reckless or criminal misconduct of Developer or any of its directors, officers, employees, or agents in respect of the performance of Developer's duties hereunder, in which event Owner may terminate this Agreement immediately upon notice to Developer;

(ii) if Developer shall fail to comply with any provision of this Agreement, and Developer shall fail either to (1) cure such default within thirty (30) days after receipt of written notice from Owner specifying the nature of the default, or (2) commence to cure the default within thirty (30) days after receipt of written notice from Owner specifying the nature of the default if the default is of such a nature that it cannot

---

[1] United States Department of Housing and Urban Development (HUD).

4

reasonably be cured within thirty (30) days, and thereafter proceeds with due diligence to cure the default;

(iii) Developer terminates the services of the persons listed on Exhibit A hereto without Owner's approval; or

(iv) any of the developing/permitting/financing, site work, or construction phases of the Project are not completed by the deadlines specified for each such phase on Exhibit B hereto and Owner notifies Developer of Owner's termination of this Agreement as a result thereof within fifteen (15) days thereafter.

(c) This Agreement shall be terminable by Owner if any of the following events occur prior to the issuance of a Certificate of Occupancy for the Project:

(i) Developer notifies Owner that "hard costs" for the construction of the Project are expected to exceed nineteen million dollars ($19,000,000);

(ii) Owner's application for a HUD Section 232 loan for the Project is denied; or

(iii) the Form I-526 immigrant petition filed with United States Citizenship and Immigration Services by any EB-5 investor with respect to the Project is denied, provided that such denial is not related to such investor's qualification as an EB-5 investor, including source of funds verification.

On August 12, 2016, while Zenith was developing the project, Linden submitted its Master Use Permit (MUP) application to the City of Seattle. In December 2016, the City's Design Review Board recommended approval with minor changes.

Zenith failed to provide PDRs for August and September of 2016, as required by the DSA. Zenith resumed providing PDRs in October 2016.

On November 16, 2016, a general contractor, Exxel Pacific, provided Zenith with a construction cost budget, estimating costs of $19,989,143 to build the project. Zenith's general manager, Jason Higbee, testified that his impression was that Exxel was not interested in working on a HUD project. The estimate was not reported to Linden.

In March 2017, another general contractor, Halvorson, provided a cost estimate of $28,313,027. This estimate was not provided to Linden. Bovée testified that, by this time, Zenith had already determined that it would use a different general contractor, Wright HD.

In order to secure a HUD loan, Zenith recommended using a certain vendor: CBRE. In February 2017, CBRE submitted a loan application. On March 1, 2017, Bovée (on behalf of Zenith) requested a payment of $35,000 for debt placement services associated with the HUD loan application. That same day, Bovée (on behalf of Linden) wrote a check payable to Zenith in the amount of $35,000. Initially, Bovée and Tu voted to approve the payment, with Chen voting against it. Tu later changed his vote to "reject."

In mid-March, Linden instructed Zenith to return the $35,000 to Linden, asserting that no agreement had been made with regard to milestone payments for debt placement services. Zenith refused to return the funds until a new debt placement agreement was reached, and stated that it would suspend its debt placement efforts. About a week later, Bovée executed a contract entitled "Debt Placement Agreement" between Linden and Zenith, on behalf of both Linden and Zenith. At trial, Bovée claimed that he conducted negotiations for this agreement with himself, as manager for Linden and as president of Zenith.

In an attempt to recoup the $35,000, Linden did not make the monthly payment of $15,000 in June or July 2017. As this dispute continued, Zenith continued to provide Linden with PDRs. On July 14, 2017, Linden removed

6

Bovée as general manger.  On July 17, 2017, Zenith filed this lawsuit against Linden alleging breach of contract.

On July 27, 2017, the Seattle Department of Construction and Inspection issued a Notice of Decision, conditionally granting the MUP application.  The notice indicated that the decision could be appealed until 5:00 p.m. on August 10, 2017.

On the afternoon of August 10, hours before the appeal period ended, Linden terminated the DSA with Zenith.  Linden explained that it was terminating the agreement because of the dispute over the $35,000, Zenith's suspension of debt placement efforts, and Zenith's failure to report that hard costs were expected to exceed $19 million dollars.

Linden brought counterclaims of breach of contract when it filed its answer to Zenith's complaint.  In both its original and amended answers, Linden pleaded material breach by Zenith as an affirmative defense.  Following a bench trial, the trial court entered findings of fact and conclusions of law.  The trial court concluded that Linden breached the DSA both by withholding monthly payments and by withholding the $50,000 MUP progress payment.  It awarded $80,000 in damages to Zenith.  The trial court also concluded that Zenith breached the DSA in multiple instances, most significantly by violating its duty of good faith when it ceased its debt placement efforts.  However, the trial court determined that Linden failed to show that those breaches resulted in damages.  Accordingly, the trial court dismissed the counterclaims.  The trial court did not enter findings as to

the materiality of Zenith's breaches. The trial court subsequently awarded Zenith attorney fees and expenses.

Linden appeals.

## II

### A

When evaluating evidence in a bench trial, our review is limited to determining whether the trial court's factual findings are supported by substantial evidence and whether those findings support the trial court's conclusions of law. Yorkston v. Whatcom County, 11 Wn. App. 2d 815, 831, 461 P.3d 392 (2020). Substantial evidence is the "quantum of evidence sufficient to persuade a rational fair-minded person the premise is true." Sunnyside Valley Irrig. Dist. v. Dickie, 149 Wn.2d 873, 879, 73 P.3d 369 (2003). On review, the evidence and all reasonable inferences therefrom must be viewed in the light most favorable to the prevailing party. Korst v. McMahon, 136 Wn. App. 202, 206, 148 P.3d 1081 (2006). Although the trier of fact is free to believe or disbelieve any evidence presented at trial, "[a]ppellate courts do not hear or weigh evidence, find facts, or substitute their opinions for those of the trier-of-fact." Quinn v. Cherry Lane Auto Plaza, Inc., 153 Wn. App. 710, 717, 225 P.3d 266 (2009) (citing Thorndike v. Hesperian Orchards, Inc., 54 Wn.2d 570, 572, 343 P.2d 183 (1959)). We review questions of law de novo. Sunnyside Valley, 149 Wn.2d at 880.

### B

Linden contends that the trial court erred by awarding damages to Zenith. This is so, Linden asserts, because Zenith was already in breach of contract

when Linden failed to perform its contractual obligations. Because Linden did not prove that Zenith's breaches were material, we disagree.

A material breach can suspend the injured party's contractual duties until the breaching party cures the defect. See DC Farms, LLC v. Conagra Foods Lamb Weston, Inc., 179 Wn. App. 205, 220-22, 317 P.3d 543 (2014). However, material breach is an affirmative defense to a breach of contract claim. See Wlasiuk v. Whirlpool Corp., 81 Wn. App. 163, 179, 914 P.2d 102, 932 P.2d 1266 (1996). Accordingly, it was Linden's burden to demonstrate that Zenith's breaches were material and thus excused Linden's nonperformance. Wlasiuk, 81 Wn. App. at 179. The trial court did not find that Zenith's breaches of the DSA were material. Therefore, Linden failed to meet its burden of proof, was not entitled to relief in the trial court, and is not entitled to relief on appeal.

To succeed in a breach of contract action, "the plaintiff must prove that a valid agreement existed between the parties, the agreement was breached, and the plaintiff was damaged." Univ. of Wash. v. Gov't Emps. Ins. Co., 200 Wn. App. 455, 467, 404 P.3d 559 (2017); accord RESTATEMENT (SECOND) OF CONTRACTS § 235 cmt. b (AM. LAW INST. 1979) (breach of contract).

A breach of contract by one party "so material as to justify a refusal of the other party to perform a contractual duty discharges that duty." DC Farms, 179 Wn. App. at 220 (citing Jacks v. Blazer, 39 Wn.2d 277, 285-86, 235 P.2d 187 (1951)). However,

> a breach of a contractual duty by one party does not always
> discharge the duty of performance of the other party, even though
> the nonperformance or breach is "wilful." As the term "breach" is
> used, a party who commits a breach is guilty of a wrong for which

9

> some remedy is available. The remedy varies with the circumstances of each case. Being guilty of a wrong does not make the breaching party an outlaw or deprive the breaching party of all rights, even the rights created by the very contract that is broken.

13 SARAH HOWARD JENKINS, CORBIN ON CONTRACTS § 68.2, at 157-58 (rev. ed. 2003) (footnotes omitted).

Whether a breach of contract is material and thus excuses further performance by the other party is a question of fact. DC Farms, 179 Wn. App. at 221; 224 Westlake, LLC v. Engstrom Props., LLC, 169 Wn. App. 700, 724, 281 P.3d 693 (2012). Here, the trial court made no determination as to whether Zenith's breaches of the DSA were material.

We have previously determined that a claim of material breach excusing performance under a contract is an affirmative defense and, accordingly, the burden of proof is on the defendant. Wlasiuk, 81 Wn. App. at 179. The absence of a finding is presumptively a negative finding against the party with the burden of proof. Taplett v. Khela, 60 Wn. App. 751, 759, 807 P.2d 885 (1991). Thus, we must presume that the trial court was not persuaded that Linden proved that any of Zenith's breaches were material.[2] Such a determination is supported by the record. Indeed, there is no evidence in the record that Zenith's breaches of the DSA resulted in damages to Linden. Hence, when the evidence is viewed in the light most favorable to Zenith, a rational fair-minded person could conclude that

---

[2] At oral argument, Linden's counsel asserted that the DSA itself defined material breaches in section 8(c). Section 8(c) allowed Linden to terminate the DSA under certain conditions. The DSA does not indicate that those conditions automatically excused further performance by Linden. Rather, it allowed Linden the option of terminating the agreement. Linden did not avail itself of this opportunity. The text of section 8(c) did not require the trial court to make a factual finding that Zenith's breaches were material.

the breach was not material.  See Sunnyside Valley, 149 Wn.2d at 879.  The trial court was, accordingly, entitled to determine that Linden failed to meet its burden of proof.

Linden argues otherwise. Citing Willener v. Sweeting, 107 Wn.2d 388, 394, 730 P.2d 45 (1986), Linden contends that Zenith, as the party claiming nonperformance by Linden, "'must establish as a matter of fact [its] own performance.'"[3]

But the cited authority does not support this proposition.  In Willener, neither the seller nor the purchaser of a piece of real property performed under an earnest money agreement.  107 Wn.2d at 394.  The vendor did not deposit in escrow the documents required to convey title and the buyer did not deposit in escrow funds equal to the sale price.  Willener, 107 Wn.2d at 394.  The Willener court explained that the parties' duties were concurrent conditions and, therefore, the prospective purchaser—who had failed to perform without excuse—had no right to bring an action for contract damages.  Willener, 107 Wn.2d at 395-96; accord Wallace Real Estate Inv., Inc. v. Groves, 124 Wn.2d 881, 897-98, 881 P.2d 1010 (1994) (letter constituting anticipatory breach by one party excused performance by the other because parties are not required to perform useless acts).

A condition is "an event, not certain to occur, which must occur . . . before performance under a contract becomes due."  RESTATEMENT § 224.  Not all duties created by contract are conditions.  For example, the passage of time cannot

---

[3] Br. of Appellant at 36 (quoting Willener 107 Wn.2d at 394).

operate as a condition, because it is certain to occur, and conditions are only events which are not certain to occur. RESTATEMENT § 224 cmt. b. Similarly, an implied duty of good faith and fair dealing exists in every contract, Pierce v. Bill & Melinda Gates Found., 15 Wn. App. 2d 419, 433, 475 P.3d 1011 (2020), review denied, 197 Wn.2d 1006 (2021), but the manner in which a party engages (such as "in good faith") cannot logically be described as an event.

Linden does not identify a condition, precedent or concurrent, that was not met when its monthly payments were due. The only condition precedent for the $50,000 progress payment was the issuance of the MUP, which the trial court determined was inevitable by the time that Linden terminated the DSA. Instead, Linden asserts that it was not obligated to perform because (1) Zenith's breach of its duty of good faith when it suspended its HUD loan efforts was material, (2) Bovée breached his fiduciary duties as Linden's manager,[4] and (3) the quality of Zenith's PDRs were below the "first quality manner standard" required by the DSA. These are not failures of conditions upon which Linden's duty to perform relied. Accordingly, Willener is inapplicable here. See Wlasiuk, 81 Wn. App at 179 ("The burden would have been on [plaintiff] to prove his performance under the contract only if his performance were a condition precedent.").

Thus, the trial court did not err by awarding damages to Zenith, despite its finding that Zenith had breached the DSA.

---

[4] Bovée is not a party to this lawsuit. Moreover, Linden did not make a claim of breach of fiduciary duties in the trial court. We do not review a case on a different theory from that which was raised and tried in the trial court. Nat'l Indem. Co. v. Smith-Gandy, Inc., 50 Wn.2d 124, 130, 309 P.2d 742 (1957).

C

Linden next avers that, even if damages were correctly awarded to Zenith, the amount should have been offset by the $35,000 disputed payment that Zenith collected from Linden. In support of this argument, Linden cites statutes—RCW 4.56.060 and RCW 4.56.070—that provide for setoffs in final judgments in circumstances in which one party owes a debt to the other. However, here, the trial court concluded that Zenith's collection of the $35,000 payment for debt collection services was not a breach of the DSA. The trial court did not find that Zenith owes a debt of $35,000 to Linden. Under these circumstances, a $35,000 setoff was not required. Linden's claim to the contrary fails.

III

Linden next contends that the trial court erred by concluding that Linden was not entitled to recover damages. Because the trial court's conclusion was supported by its factual findings, and those findings are supported by the record, Linden's claim of error fails.

To prevail in a breach of contract action, a party must prove that a valid agreement existed between the parties, the agreement was breached, and the party was damaged. Univ. of Wash., 200 Wn. App. at 467; accord RESTATEMENT § 235 cmt. b (breach of contract). Here, the trial court concluded that Linden failed to prove damages. This conclusion was based on its factual findings that Linden did not proffer evidence that Zenith's breaches of the DSA caused damages, including damages for delay.[5] Rather, Linden's expert witness was

---

[5] See Findings of Fact 97, 98, and 99.

unable to pinpoint a reason for delays to the project beyond "general mismanagement" by Zenith.

Linden asserts that it suffered damages as a result of Zenith's breach because, after Linden terminated the DSA, another partner (Village Concepts) withdrew from the project and because Zenith's poor performance delayed the project. However, Linden remains unable to point to any evidence in the record that Zenith's breaches of the DSA caused delays or other damages to Linden. The trial court was entitled to conclude that Linden failed to meet its burden of proof.

Linden also contends—for the first time on appeal—that Zenith owed Linden a fiduciary duty that it breached by accepting the $35,000 debt placement payment authorized by Bovée. According to Linden, Zenith should thus be required to disgorge the $35,000. As this claim was not raised in the trial court, there is no trial court determination for us to review. We decline to review this claim of error, raised for the first time on appeal. Nat'l Indem. Co., 50 Wn.2d at 130.[6]

IV

Finally, Linden contends that the trial court erred by awarding attorney fees to Zenith. Because we affirm the trial court's substantive determinations, Zenith remains the prevailing party and was entitled to a fee award under the DSA.

---

[6] Linden avers that this fiduciary duty existed prior to the effective date of the DSA. Regardless, the trial court's conclusion that as a matter of law the "Standards of the Performance" created by the DSA did not apply prior to the effective date of the DSA is correct.

The DSA provides:

> 15. <u>Attorneys' Fees</u>.  Should it become necessary for either Party, because of a breach under this Agreement or any other reason, to place the enforcement of this Agreement or any part thereof in the hands of an attorney or to file suit upon same, it is agreed that the non-prevailing Party shall pay all costs and expenses, including reasonable attorney's fees, incurred in connection therewith.

Zenith was the prevailing party.  Accordingly, the trial court did not err by awarding attorney fees to Zenith.[7]

Affirmed.

_____
Dwyer, J.

WE CONCUR:

_____        _____
Coburn, J.                       Appelwick, J.

---

[7] Both parties seek an award of attorney fees on appeal pursuant to RAP 18.1.  Because the DSA provides that the prevailing party is entitled to such an award, Zenith is entitled to an award of fees on appeal.  Upon a proper application, a commissioner of our court will enter an appropriate award.